786 P.2d 971

In the Matter of a Member of the State Bar of Arizona, Donald C. GALBASINI, Respondent.

No. SB–89–0010–D.

Supreme Court of Arizona, In Banc.

Jan. 30, 1990.

Theodore E. Carver, Tempe, for respondent.

State Bar of Arizona by Edward D. Fitzhugh, State Bar Counsel, Phoenix.

CAMERON, Justice.

## I.  JURISDICTION

The Arizona State Bar Disciplinary Commission of the Supreme Court (Commission) recommends suspension from the State Bar of Arizona (Bar) for Donald C. Galbasini (respondent) for six months and payment of $2,915.25 in costs. Respondent

objects. We have jurisdiction pursuant to Rule 53(e), 17A A.R.S. Sup.Ct.Rules.

## II. CHARGES

Respondent was charged by the Bar with five counts of misconduct. Two of the counts (two and five) were dismissed by the Hearing Committee (Committee). The Commission agreed with this dismissal. We also agree and consider only the remaining three counts.

## COUNT ONE

That on or about September, 1986, you collected funds on behalf of your client, Smith Pipe and Steel. Despite repeated requests from your client and in violation of your professional duties you failed to promptly convey these funds to your client, when requested, with a full accounting. Your conduct violated Rule 44(b), Rules of the Arizona Supreme Court, particularly ER 1.15.

## COUNT THREE

That you failed to communicate with your client during the period of September, 1986 to January, 1987. Your client's agents and representatives made repeated attempts to contact you without any response. This is in violation of Rule 42, Rules of the Arizona Supreme Court, particularly ER 1.4.

## COUNT FOUR

That employees personally under your supervision, specifically Phil Hammond and Frank Sexton, solicited legal business from Smith Pipe and Steel. Your conduct violated Rule 42, Rules of the Arizona Supreme Court, more specifically ER 7.3. Further that in violation of Rule 42, Rules of the Arizona Supreme Court, more specifically ER 5.3, you failed to properly control a non-lawyer under your supervision.

## III. FACTS

In August 1986, respondent entered into an agreement with a company called RMJ, Inc. in connection with RMJ's "credit consulting" business. RMJ was not licensed to operate as a debt collection agency in Arizona and needed an attorney like respondent to provide it with a name and license. The contract provided, in pertinent part:

## AGREEMENT

This Agreement entered into this 10th day of August, 1986, by and between R.M.J., Inc., of Mesa, AZ (hereinafter called "RMJ") and DONALD C. GALBASINI, Attorney-at Law of Mesa, AZ (hereinafter called "Attorney").

## RECITALS

A. RMJ is an Employer Management Firm, expert in Accounts Receivable Management and specializing in the credit consultant field.

B. Attorney is licensed in the State of Arizona dealing in collection work and desires to contract with RMJ to act as managers of and to train employees in credit para-legal work.

C. RMJ desires to act as managers for Attorney's para-legal staff.

## COVENANT

Therefore the parties agree and covenant as follows:

1. RMJ agrees to be responsible for, but not limited to, the hiring, firing, training, supervising, maintaining payroll records, maintaining commission records, payment of attorneys' employees, withholding of taxes, remitting of payroll taxes, and all other management functions related to said employees.

2. Attorney shall maintain overall control over the employees and RMJ's mode of direction of the employees involved in the para-legal work.

3. All amounts collected from debtors shall be under the control of Attorney in his Trust Account to be paid over to clients in accordance with A.R.S. Section 32–1055(D)(1) and as appropriate to RMJ.

4. In consideration of the foregoing acts and responsibilities, of paragraph 1,

Attorney shall pay to RMJ ninety-eight percent (98%) of gross fee income for services rendered. For this purpose, gross fee income is defined to be credit collections less that portion remitted to clients. Employees of attorney will be paid from the payments made to RMJ.

5. RMJ shall be solely responsible for paying, from their own account, for all operating costs incurred by RMJ.

6. It is understood that Attorney may be required to perform legal services in pursuing collection activities. Payment for these services shall be billed to and deducted from accounts to be paid to RMJ, as set out under paragraph 4 above.

\*    \*    \*    \*    \*    \*

To carry out this contract, RMJ leased an office separate from respondent's law office. A sign with respondent's name and professional title was placed in front of the RMJ office. RMJ employees at this office answered the phone "Law offices of Donald Galbasini" or just "Law offices."

The extent of respondent's "management" and "supervision" over the collection agents was minimal at best. In the first month of the relationship, respondent received frequent reports on the financial activity in his trust account from an RMJ principal who was a Certified Public Accountant (CPA). The frequency and quality of those reports declined, however, after the first month because the principal left.

Respondent claimed he visited the RMJ offices once or twice a week. When asked if he ever actually instructed the collection agents on practices allowable under state and federal regulations or even spoke to the agents, respondent admitted that he was "not allowed to do that" by the principals of RMJ.

An RMJ employee, Donald Kenneth Angle, testified at his deposition:

Q Now earlier, you made reference to letters that you sent to debtors or in response to the letters you received?

A Okay.

Q And in these responses, the letters were typed on Mr. Galbasini's letterhead, is that correct?

A Correct.

Q When you signed these letters, what did you sign as your title or position?

A They were not direct correspondence. The debtor letters that you refer to, the initial letter going out to a debtor upon receipt of a delinquent account, it was a form letter.

Q Who signed it?

A I think one of the secretaries initialed it, if I recall.

Q Who initialed it on the behalf of whom?

A It would be the initialing D.G., Don Galbasini.

Q Was Mr. Galbasini aware these letters were sent out on his letterhead?

A No.

Q Numerous of these letters were sent out, is that right?

A Yes.

Q And these letters would be signed and processed and mailed from your office?

A Correct.

Q And Mr. Galbasini was in the office on numerous occasions?

A I have to backtrack, if I may. They weren't sent out from our office. They are sent out from a computer firm that managed the data processing work. They didn't actually leave from that office. We would type in the information on a computer in the office, and then they would send it from a different location.

Respondent knew RMJ had prepared a document entitled "Engagement Agreement" that was used as a contract between clients and RMJ but was phrased as though the client was hiring the Law Offices of Donald Galbasini. According to respondent, the agreement was intended only for existing RMJ clients and not for solicitation of new clients. As it turned out, RMJ employees used the agreement to solicit new clients, although no evidence indicated that respondent knew of such use

or that any new client executed the agreement.

By the end of October, respondent became concerned about his relationship with RMJ and requested an informal ethics opinion from the State Bar Ethics Advisory Committee on the propriety of his actions. Before receiving a reply he terminated the agreement, effective January 1987.

Serious problems surfaced after the relationship was terminated. Respondent learned of several "clients" whose accounts were collected by RMJ without remittance of the client's share. For example, the particular client whose complaint initiated this proceeding was Smith Pipe and Steel (Smith). After Smith was informed by the debtor that RMJ was paid $5,627.71, Smith unsuccessfully attempted to collect its share from RMJ. Smith's attorney attempted to contact respondent by telephoning the RMJ office, but was always told that respondent was out or unavailable. Messages were never forwarded to respondent and calls were never returned by anyone from RMJ. Respondent first learned of Smith's problem when the State Bar requested his response to Smith's complaint.

The Hearing Committee received evidence on 27 and 28 April 1988, and issued its report on 29 June. The Committee found violations of The Model Rules of Professional Conduct, particularly ER 1.4 (Communication), ER 1.15 (Safekeeping Property), ER 5.3 (Responsibilities Regarding Nonlawyer Assistants) and ER 7.3 (Direct Contact with Prospective Clients). It was also found that respondent violated Rule 44(b) of the Rules of the Supreme Court (Trust Accounts; Duty to Safeguard Client Property). The Committee made extensive findings of facts and recommended public censure as a sanction.

Respondent objected to the recommendation of censure, maintaining that an informal reprimand was a more appropriate sanction.

The Commission adopted the Committee's findings of facts and conclusions of law. The Commission, however, rejected respondent's suggestion of an informal (private) reprimand, as well as the Committee's recommendation of (public) censure. Instead, it recommended, in a 7–1 vote, that respondent be suspended for six months. The Commission believed that "the respondent knew or should have known of the potential for abuse but did not act quickly to remove himself from the situation." The Commission believed that respondent's conduct was so egregious that a more severe sanction was warranted. Respondent contests the Commission's recommendations.

## IV. DISCUSSION

### Count One

There appears to be no question that if respondent is responsible for the actions of RMJ's nonlawyer employees, then he violated the Rules of Professional Conduct, particularly ER 1.4 (Communication), ER 1.15 (Safekeeping of Property) and Rule 44(b) (Safeguarding Client's Property). The first question we must answer is whether respondent violated ER 5.3, which states:

ER 5.3 RESPONSIBILITIES REGARDING NONLAWYER ASSISTANTS

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner in the law firm in which the person is employed, or

has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

17A A.R.S.Sup.Ct.Rules, Rules of Professional Conduct, Rule 42, ER 5.3. Authorities have commented on this rule as follows:

"Reasonable" Supervisory Efforts

An attorney who supervises a nonlawyer associate is not required to guarantee that the associate will never engage in "incompatible" conduct, for that would be tantamount to vicarious liability. On the other hand, if a supervising lawyer takes no precautionary steps at all, he or she violates Rule 5.3 whether or not their nonlegal associates misbehave.

Circumstances will dictate what constitutes a "reasonable effort" to instill in nonlawyer personnel an appropriate respect for their duties. Certainly new personnel must be carefully screened and given at least some instruction in the fundamentals of professional responsibility.

\*     \*     \*     \*     \*     \*

G. HAZARD, JR. & W. HODES, THE LAW OF LAWYERING: A Handbook on the Model Rules of Professional Conduct, p. 464 (1989).

Respondent contends that, according to ER 5.3, a supervisory attorney of a nonlawyer assistant is not vicariously liable for the misconduct of said associate. Respondent further contends that he acted reasonably under the circumstances and that because he did not know what was going on in the office he should not be held liable according to ER 5.3.

Although ER 5.3 may not establish a rule of vicarious or imputed liability, it does mandate an independent duty of supervision. Here, respondent conducted no supervision, reasonable or otherwise. Even in the first weeks of the contract when respondent received information from RMJ's CPA, there was no evidence that he reasonably or adequately supervised the nonattorney assistants. We therefore believe that respondent acted unreasonably under the circumstances and violated ER 5.3.

Respondent allowed RMJ to use his name and license to practice law and commit various acts contrary to Rule 42 and 44, Rules of the Supreme Court. The potential for abuse of his name and title should have been apparent to respondent. Having provided no supervision whatsoever to guide the actions of the nonlawyer employees of RMJ, respondent cannot now claim that he should not be held liable for the misconduct of the nonlawyer employees.

We believe respondent violated The Rules of Professional Conduct, particularly ER 1.4, ER 1.15, ER 5.3 and Rule 44(b) of the Rules of the Supreme Court.

### Count Three

In Count Three, respondent is accused of failing to communicate with his clients in violation of ER 1.4 which reads:

ER 1.4  COMMUNICATION

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Rules of Professional Conduct, ER 1.4.

As noted above, respondent had no idea who his clients were. Respondent did not know, for example, that Smith's lawyer was trying to reach him and that the messages left with RMJ were not forwarded.

Respondent did know, however, that RMJ's office was held out as respondent's office—from the sign on the door to the way the telephone was answered. Therefore, the public and the clients had every reason to believe they were dealing with respondent. Respondent failed to communicate with clients because his nonlawyer employees failed to communicate with him. We believe respondent violated the Rules of Professional Conduct, particularly ER 1.4.

### COUNT IV

In Count Four respondent is charged with violation of Rule 42, Rules of the

Supreme Court and particularly ER 7.3, which provides:

### ER 7.3 DIRECT CONTACT WITH PROSPECTIVE CLIENTS

(a) A lawyer may not solicit professional employment from a prospective client with whom the lawyer has no family or prior professional relationship in person or by telephone, when a motive for the lawyer's doing so is the lawyer's pecuniary gain.

\*　　\*　　\*　　\*　　\*　　\*

Rules of Professional Conduct, ER 7.3

Apparently, two RMJ employees solicited business using respondent's name as an inducement. They had business cards printed that stated above the employee's name: "R.M.J. Management Group, Inc." and "Management for the Law Offices of Donald C. Galbasini." Under the employee's name was the address and telephone number of the RMJ office.

There is no question that this was done for RMJ's pecuniary gain. Again, respondent's failure to properly or reasonably supervise nonlawyer employees of RMJ made respondent responsible for the actions of the two salesmen.

Respondent violated ER 7.3(a) of the Rules of Professional Conduct.

## V. SANCTIONS

The following factors should be considered in imposing sanctions:

In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors:

(a) the duty violated;

(b) the lawyer's mental state; and

(c) the actual or potential injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

American Bar Association *Standards for Imposing Lawyer Sanctions*, Standard 3.0 (1986).

The Standards are understandably strict when the mishandling of client property is involved. Standard 4.1 reads in part:

4.1 Failure to Preserve the Client's Property

Absent aggravating or mitigating circumstances, upon application of the factors set out in 3.0, the following sanctions are generally appropriate in cases involving the failure to preserve client property:

4.11 Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

4.12 Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

4.13 Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

4.14 Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.

ABA *Standards*, Standard 4.1.

Admittedly, respondent did not know of every incident of improper conduct committed by the unsupervised nonlawyer assistants until after the fact. There are, however, numerous incidents where RMJ employees knowingly converted client property, causing injury to the client. Under ER 5.3 (Responsibilities Regarding Nonlawyer Assistants), a lawyer is responsible for the conduct of nonlawyer assistants because he has a duty to make reasonable efforts to supervise such persons. Therefore, we believe that respondent knew or should have known of RMJ's employee's actions and his case fits within ER 4.12 calling for suspension.

We next consider aggravating and mitigating circumstances.

### A. Aggravation

The ABA *Standards* list aggravating and mitigating circumstances which we take into account when determining what sanction to impose. *See* ABA *Standards*, Standard 9.1. Aggravating circumstances are defined as follows:

9.21 *Definition.* Aggravation or aggravating circumstances are any considerations or factors that may justify an

**126**

increase in the degree of discipline to be imposed.

ABA *Standards,* Standard 9.21.

The ABA *Standards* then list ten aggravating circumstances that may apply. *See* Standard 9.22. Aggravating circumstances other than those listed may exist because the list is not exhaustive. Although it does not fit exactly into the recommended *Standards,* we believe the large and potentially larger numbers of clients and members of the public who could have been damaged by respondent's failure to exert control over the nonlawyer employees is and should be an aggravating circumstance, and we so find.

### B. Mitigation

Mitigation is defined:

9.31 *Definition.* Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.

ABA *Standards,* Standard 9.31.

We believe two mitigating factors are present in this case:

9.32 *Factors which may be considered in mitigation.* Mitigating factors include:

   *    *    *    *    *    *

(d) timely good faith effort to make restitution or to rectify consequences of misconduct;

(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;

   *    *    *    *    *    *

ABA *Standards,* Standard 9.3.

Respondent made every effort to rectify his errors when he withdrew from the contract in January. Ultimately, he was out of pocket $8,359.53 for purchases made by RMJ and he also repaid $7,757.59 to RMJ clients because of RMJ's dereliction. Respondent tried to make amends and apparently no one except respondent suffered any financial losses.

Respondent also made full and free disclosure and cooperated fully with the Bar. We believe under the circumstances that a six month suspension is a proper sanction.

Finally, we wish to note that the license to practice law is conferred on a person after rigorous schooling, difficult examinations and proof of good moral character. The license is personal to the lawyer, and not for sale or lease. A lawyer retains the license only so long as he or she upholds the high standards of the legal profession. If a lawyer disregards his or her professional responsibilities by allowing nonlawyers to operate a law office in his or her name, he or she cannot complain when held responsible for the nonlawyer's misdeeds.

We affirm the recommendations of the Commission for a six month suspension and costs in the amount of $2,915.25.

GORDON, C.J., FELDMAN, V.C.J., and MOELLER and CORCORAN, JJ., concur.