793 P.2d 1095

**In the Matter of a Member of the State Bar of Arizona, Ernesto Rolando CASTRO, Respondent.**

**No. SB–88–0051–D.**
**Disciplinary Comm. No. 5–0020.**

Supreme Court of Arizona,
In Banc.

June 21, 1990.

Jerry L. Smith, Flagstaff, for respondent.

State Bar of Arizona by Harriet L. Turney, Chief Counsel, Phoenix, and Walraven & Roberts by Paul L. Roberts, Prescott, for State Bar of Arizona.

## OPINION

CAMERON, Justice.

### I. JURISDICTION

The Disciplinary Commission of the Supreme Court of Arizona (Commission) recommends respondent, Ernesto R. Castro, be suspended from the practice of law in Arizona for a period of 30 days and pay $500 in restitution. The conduct in question occurred prior to the adoption of the Rules of Professional Conduct, effective 1 February 1985. 17A A.R.S.Sup.Ct.Rules, Rule 42. The Code of Professional Responsibility (former Rule 29(a)), therefore, applies to the conduct in this case. *See In Re Pappas*, 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988).

We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and 17A A.R.S. Sup.Ct. Rules, Rule 53(e).

### II. ISSUES

On review, we address two issues:

1. Was there clear and convincing evidence to support the Committee's and Commission's findings of respondent's ethical misconduct?
2. Was the Commission's recommendation for a 30 day suspension and restitution of $500 an appropriate sanction in this case?

### III. PROCEDURAL HISTORY

On 5 February 1986, the State Bar of Arizona (Bar) filed a two-count complaint against respondent. The first count alleged that respondent improperly handled his client's funds. The second count alleged that he failed to properly represent his client. Respondent answered the complaint and the Hearing Committee (Committee) began disciplinary proceedings on 5 January 1988. The Committee filed its report on 12 February 1988 and recommended public censure under Count One (Improperly Handling a Client's Funds) and a 30-day suspension under Count Two (Failure to Properly Represent a Client). A minority of the Committee recommended a 30-day suspension for both counts. Respondent filed an objection to the Committee Report on 11 March 1988.

The Commission heard oral arguments on 9 July 1988 and filed its report on 18 July 1988, adopting the Committee's findings of fact and conclusions of law. By a 7 to 1 vote, the Commission recommended a 30-day suspension and $500 in restitution to be paid to respondent's client. The sole opposing vote recommended a longer suspension.

Respondent filed a timely notice of appeal to this court objecting to the Commission's findings of fact, conclusions of law and recommended sanctions.

### IV. DISCUSSION

In disciplinary proceedings, we sit as an independent trier of both fact and law in the exercise of our supervisory responsibility over the State Bar and its members. *Pappas*, 159 Ariz. at 518, 768 P.2d 1161. We will, however, give deference and serious consideration to the findings and recommendations of both the Committee and the Commission. *Id.* The burden remains on the Bar to prove by clear and convincing evidence that respondent violated his ethical obligations. *Id.*

### A. *Count One*

In August 1983, respondent agreed to represent Aubrey L. Isbell (Isbell). Isbell was 57 years old and had been involved in more than 15 prior criminal matters. In 1983, Isbell was convicted of three felony counts of aggravated assault and was incarcerated in the Arizona State Prison at Perryville. Isbell employed respondent to perfect an appeal from those convictions

and agreed to pay respondent $200 a month for his services. Respondent claims that the agreement was for a fee of $5,000, payable at $200 a month, plus expenses. This fee agreement was not reduced to writing although evidence in the record indicates that the agreement was for a total of $5,000. Respondent appealed Isbell's convictions and received monthly checks from Isbell for fees ($200 per month) and other expenses. Respondent represented Isbell from August 1983 to October 1984 and received a total of $1,850 for fees and expenses.

In January 1984, Isbell requested respondent's assistance in obtaining a medical release from prison. A medical release hearing was scheduled for June 1984. Respondent received funds from Isbell for attorney's fees, witness fees and other related expenses. In March 1984, Isbell requested an accounting of the fees paid to respondent. Respondent claims he furnished Isbell an accounting at the medical review hearing and that Isbell approved it.

The Committee found that respondent received funds for costs of a transcript on appeal and for the employment of expert medical testimony. The Committee noted respondent "failed to maintain complete records of these client funds and was specifically unable to provide an accounting of such funds to the Committee from contemporaneously created records." The Committee also found respondent received funds to which he was not entitled. Specifically, in December 1983, respondent received $200 in excess of the $200 a month which Isbell agreed to pay.

The evidence indicates that respondent never sent a billing statement or any other record to Isbell during the entire time he represented him. Almost every month, Isbell sent respondent a check for $200 and sometimes more. At one point, Isbell signed several blank checks and respondent filled in the blanks as expenses or monthly payments became due.

Respondent admitted that his "bookkeeping with respect to the entire matter was not the best." Respondent failed to keep time records and receipts in Isbell's case; instead, he merely maintained as a record "just a bunch of little chits that I would write." Respondent testified before the Committee as follows:

Q. Did you have any written record, ledgers, journals, any financial books that you kept during this time period?

A. No.

Q. None whatsoever?

A. Just my check account.

Q. How would it be possible for you to determine what Mr. Isbell paid you in the course of your representation?

A. I believe at that time, that for each client I had a little pad in my desk, and as monies came in, they were credited in their name, and as soon as the account was over, that piece of paper was thrown away

Q. Where is that piece of paper for this account?

A. I don't have it; I don't have it.

Q. When was it thrown away?

A. Probably when I moved into my other office.

Q. When was that?

A. Three years ago.

Regarding the excess $200 he received from Isbell in December 1983, the Committee questioned respondent as follows:

Q. Now, by my calculations, Mr. Castro, you got $200 in August from check No. 202; you got $200 in September from check No. 204; you got $200 in November from check No. 135; you got $200 in December from check No. 210. At the most you were due $200 for the month of October when you met with him on December 14, and perhaps due $200 for the month of January; where does the additional $400 come from to comprise this check No. 209?

A. Is there a check for October any place there?

Q. Not according to my review.

A. Okay, it would be October, November, December, and we're getting close to January, I believe.

Q. According to my review of this, you received check No. 135, dated Novem-

**431**

ber 7, 1983, which included a $200 payment for your fees, and you have told us—you have testified that you received check No. 210, dated December 6—should be 1983—for a $200 fee. So, that takes November and December out of the calculations.

A. Oh, you mean on the—the check 135?

Q. Yes.

A. I don't—I don't know how to explain it, to be honest with you.

The Committee found that respondent violated former DR 9–102(B)(3) (Preserving the Identity of Funds and Property of a Client), Rule 29(a), Rules of the Supreme Court, which provided:

(B) A lawyer shall:

\* \* \* \* \* \*

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

The Commission adopted the Committee's finding and we agree with both the Committee and the Commission. Respondent failed to keep a complete financial record and failed to provide an appropriate accounting of all funds received from Isbell.

### B. *Count Two*

In January 1984, while incarcerated, Isbell was treated for a bleeding ulcer. Isbell's treating physician noted that Isbell's condition was "very critical" and "near death." After his release from the hospital, Isbell discussed his health problems with respondent. Apparently, Isbell told respondent that his life was in danger and that he lost 90–95% of his stomach during surgery. Respondent decided to seek a medical release for Isbell and obtained Isbell's medical records in March 1984. He then moved for an order to release Isbell on the grounds that his "continued confinement would endanger his life." *See* A.R.S. § 13–3961. Hearing on the motion for release was held on 22 June 1984.

With respect to the medical review hearing, the Committee found that respondent:

A. Failed to make adequate efforts to communicate with ISBELL's treating physician.

B. Failed to make adequate arrangements to provide for evidentiary testimony sufficient to permit the introduction of ISBELL's medical records after the trial court, by minute entry dated May 18, 1984, had cautioned Respondent that it was his responsibility to secure subpoenas for the attendance of whatever witnesses or documents may be required to establish the state of ISBELL's health.

C. Failed to initiate efforts to obtain independent expert testimony from non-treating physicians until June 18, 1984, at which time consultation was had with Dan Morris, M.D. (The Committee acknowledges the testimony of Respondent that informal communication was had with L.C. Runke, M.D. at approximately the same time as communication with Morris, M.D. and for which no consultation fee was charged.)

\* \* \* \* \* \*

E. Notwithstanding the above, Respondent obtained from ISBELL $500 for the purpose of paying for expert testimony.

F. Respondent employed Connie Auguste to review the medical records of ISBELL and testify at the hearing of July 6, 1984 without any reasonable expectation that Auguste could either lay sufficient foundational testimony for the introduction of medical records or offer an expert medical opinion as to ISBELL's alleged medical condition.

G. Respondent failed to obtain any additional evidence or expert medical testimony to support the motion for release.

H. Respondent failed to seek a continuance of the July 6, 1984 hearing in order to obtain additional time to locate expert medical testimony required to support the allegations of the motion for release.

432

I. Respondent wholly failed to offer in evidence the medical records of ISBELL.

In denying respondent's motion for release of Isbell, the trial court noted that neither Isbell nor Auguste were competent to testify as to Isbell's medical condition and that Isbell's medical records were never offered into evidence.

The Committee concluded that respondent violated former DR 6–101 which provided:

(A) A lawyer shall not:

    \*   \*   \*   \*   \*   \*

(2) Handle a legal matter without preparation adequate in the circumstances.

(3) Neglect a legal matter entrusted to him.

The Commission adopted the Committee's findings of fact and conclusions of law. We agree.

Isbell's hospital record stating that his condition was "very critical" and "near death" was central to Isbell's claim. Respondent contacted Connie Auguste and asked her to explain the medical records to him so he could better understand Isbell's condition. Although Auguste was neither a physician nor a medical expert, she was a consultant in legal-medical matters and was previously licensed as a nurse in California. Auguste indicated that Isbell was not in any danger of dying either during or after surgery for his bleeding ulcer. Respondent also consulted both Drs. Runke and Morris, neither of whom was Isbell's treating physician. Both Runke and Morris told respondent that Isbell was not in any life-threatening danger. Because of these adverse opinions, the testimony of the treating physician and the medical record explaining Isbell's condition before the surgery were vital to Isbell's case. Nevertheless, the treating physician was not called to testify nor was the medical record properly introduced into evidence.

Bar counsel asked respondent the following questions regarding the treating physician:

Q. Why is it, Mr. Castro, you didn't call as a witness at the hearing, this doctor, who in the medical records had placed that the condition was life threatening?

A. Because basically, I didn't know who he was. There was some physician from Maricopa County. I made every inquiry I could to find out who had treated him, and I had left messages there to please contact me. And again, I was operating in a very limited time frame of approximately ten days.

  \*   \*   \*   \*   \*   \*

Q. Tell me what you did to make the determination of which doctor it was that in the medical records stated Mr. Isbell's condition was life threatening?

A. I didn't make that determination.

Q. Tell me what you did to try and determine what doctor it was that stated it in the medical records?

A. There was a list of physicians from the radiologist on up, and one of those—you know, if you try and read those notes as a layman and read their writing, I don't know who they were.

Q. Tell me what you did, Mr. Castro, to determine which doctor wrote in the medical records that Mr. Isbell's condition was life threatening.

A. My procedure was to call the Maricopa County Hospital indicating that I was the attorney of Lynn Isbell and would they please give me information relating to the treating physicians, period. Now, at first, Lynn Isbell had directed me to the physicians at Perryville, and these were my initial inquiries, was to Perryville. They referred me to Maricopa County, and in Maricopa County is where I traced these records down.

Q. You did take some steps to determine which doctor it was that ...

A. Yes, I did.

  \*   \*   \*   \*   \*   \*

Q. Did you take the opportunity to discuss with the custodian of the records at Maricopa Medical Center, which doctor it would have been that noted that in Mr. Isbell's medical records?

A. I don't believe so.

We agree with Bar counsel's argument before the Commission:

At the minimum—at the bare minimum—in order to be properly prepared without any expert testimony or anything else, those medical records should have been introduced as evidence at the medical review hearing in front of Judge Sult. All that would have taken is the custodian of records. It's a hearsay exception, a regularly conducted activity of a business. It was done at a medical center. It would have gone in. Jim Sult made a point of that—Judge Sult made a point of that in his minute entry that he issued in regard to that medical review hearing. Those medical documents were not ever even offered into evidence, and that's the only place that Mr. Castro had at his disposal, at the date of the hearing, to show that, in fact, the situation was life threatening.

We find that respondent, in his preparation for the medical release hearing, violated former DR 6–101(A)(2) & (3) (Failing to Act Competently).

## V. SANCTIONS

We have the ultimate authority to impose sanctions on members of the Bar. *In re Arrick*, 161 Ariz. 16, 22, 775 P.2d 1080, 1086 (1989). The main purpose behind attorney discipline is to protect the public and deter others from misconduct. *In re Fresquez*, 162 Ariz. 328, 783 P.2d 774, 780 (1989). We look to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) for guidance in determining the appropriate sanctions. *Arrick*, 161 Ariz. at 22, 775 P.2d 1080. The ABA *Standards* list the following factors to consider in imposing the appropriate sanction: (1) the duty violated, (2) the lawyer's mental state, (3) the actual or potential injury caused by the lawyer's misconduct, and (4) the existence of aggravating or mitigating circumstances. ABA *Standards*, Standard 3.0.

The Committee in this case recommended that respondent be given public censure under Count One and a 30–day suspension under Count Two. The Commission, however, did not delineate its recommendation under each count. Instead, the Commission recommended a 30–day suspension and $500 restitution to Isbell. We consider respondent's acts under both counts in reaching our decision as to a single appropriate sanction.

Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client. ABA *Standards*, Standard 4.13. Regarding respondent's failure to maintain adequate financial records, we note the following:

Reprimand should be reserved for lawyers who are merely negligent in dealing with client property, and who cause injury or potential injury to a client. Suspension or disbarment as applicable under Standards 4.11 and 4.12 and the commentary thereto is appropriate for lawyers who are grossly negligent. For example, lawyers who are grossly negligent in failing to establish proper accounting procedures should be suspended; reprimand is appropriate for lawyers who simply fail to follow their established procedures.

ABA *Standards*, Commentary to Standard 4.13.[1]

With regard to respondent's failure to act competently, we note the following:

Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether he or she is competent to handle a legal matter, and causes little or no actual or potential injury to a client.

ABA *Standards*, Standard 4.54.

In support of a lesser sanction than that recommended by the Committee and the Commission, we consider several mitigating factors that may justify a reduction in the degree of sanction to be imposed. *See* ABA *Standards*, Standard 9.31. We note

---

1. Public reprimand under the ABA *Standards* is the same as public censure under our Rule 52(a)(4), Rules of the Supreme Court. Admonition under the ABA *Standards* is the same as informal reprimand under our Rule 52(a)(5).

that respondent did represent Isbell in his appeal, among other things, for more than one year and was paid less than the agreed upon total fee. This factor indicates an absence of a dishonest or selfish motive on the part of respondent. *See* ABA *Standards*, Standard 9.32(b). Moreover, we find respondent's inexperience in the practice of law a mitigating factor because he was admitted to the practice of law in August 1982 and the events in this case started in August 1983. *See* ABA *Standards*, Standard 9.32(f). Finally, we note that Isbell suffered no actual injury due to respondent's improper introduction of the medical records at the medical release hearing. See ABA *Standards*, Standard 4.54. Even with competent counsel, Isbell probably would not have been released because he was not in any life-threatening danger at the time of the hearing.

One aggravating factor existing in this case is respondent's prior disciplinary offense. *See* ABA *Standards*, Standard 9.22(a). On 17 February 1987, but before the hearing in this case, the Commission issued a private reprimand to respondent for appearing in justice court while intoxicated.

Considering both the mitigating and aggravating circumstances in this case, we note the following:

> Each disciplinary case involves unique facts and circumstances. In striving for fair disciplinary sanctions, consideration must necessarily be given to the facts pertaining to the professional misconduct and to any aggravating or mitigating factors. Aggravating and mitigating circumstances generally relate to the offense at issue, matters independent of the specific offense but relevant to fitness to practice, or matters arising incident to the disciplinary proceeding.

ABA *Standards*, Commentary to Standard 9.1. We believe reprimand (public censure) is a more appropriate sanction in respondent's case.

The Commission also recommended that respondent pay $500 in restitution to Isbell, presumably for the amount Isbell paid to respondent for Auguste's expert medical testimony. We believe restitution is appropriate under the facts of this case.

Finally, the Bar has filed a statement of its administrative costs and expenses in the processing of this disciplinary matter. We order respondent to pay $2,659.80 in costs, pursuant to Rule 53(e), Sup.Ct.Rules, 17A A.R.S.

## VI. ORDER

Respondent Ernesto R. Castro is publicly censured and ordered to pay $500 in restitution to Aubrey Lynn Isbell and $2,659.80 to the Bar for costs.

GORDON, V.C.J., and CORCORAN, J., concur.

MOELLER, Justice, specially concurring.

My review of the record leads me to conclude that the Bar failed to show by clear and convincing evidence that respondent committed the violation charged in Count II. A large part of the majority's opinion relative to this count is based on the assertion that the respondent committed an ethical violation when he failed to secure the admission into evidence of his client's medical records at the release hearing. My reading of the record shows that respondent reviewed the medical records, found much in them harmful to his client's cause, and made a judgment call that he would not put the written records into evidence. Instead, he orally introduced into evidence the contents of portions of the records, and only those portions, which were helpful to his client. Some may opt for a different strategy, particularly with the benefit of hindsight. But there was no adequate showing that respondent breached the ethical code in proceeding in the manner in which he proceeded. Nevertheless, I concur in the issuance of a censure because, with respect to Count I, I agree that respondent had a woefully inadequate bookkeeping system, that his lack of such a system constituted an ethical violation, and that a censure is an appropriate remedy on the Count I violation. Because the restitu-

tion order of the majority is apparently based on Count II, I would not impose it.

FELDMAN, Vice Chief Justice, specially concurring.

I concur in the result and in the views expressed by Justice Moeller. I write separately to express my views on the so-called "bookkeeping system" used by this respondent. Respondent testified that he threw away the "chits"—little pieces of paper on which he made notations about funds received—and was therefore unable to render an account of his clients' funds, as required by the former rules. *See* DR 9–102(B), former Rule 29(a), Ariz.R.Sup.Ct., 17A A.R.S. (hereafter Rule _____).

As I see it, he would have been unable to render an adequate account even if he had kept the chits and claimed they had served to refresh his memory. The rule he was charged with violating, DR 9–102(B)(3), required an attorney to maintain *"records"* of all client funds in his possession and to render an appropriate *"account"* to the client regarding those funds (the present equivalent is Rule 43(a)). Such records should comply with generally accepted accounting principles or, at least, bookkeeping standards. While lawyers need not be skilled accountants, they are charged with the responsibility of maintaining records that will enable them to account for client funds in a businesslike manner. Attorneys lacking knowledge in bookkeeping or accounting should retain a bookkeeper or accountant to set up a proper system of accounting for their office.

Slips of paper on which notations are made that may serve to refresh the recollection of the lawyer some years after the event do not qualify as records or books of account. In the future, I will take the position that lawyers who cannot produce acceptable ledgers, journals, or other recognized books of account will have failed to comply with the current requirements of ER 1.15, Rule 42. More importantly, they will have failed to comply with Rule 43, the Trust Account Guidelines of the State Bar of Arizona adopted pursuant to Rule 43(d), and Rule 44. Not having acceptable records of clients' funds is, *without more,* grounds for summary suspension under the present rules. *See* Rule 43(g).