877 P.2d 789

**In the Matter of a Member of the State Bar of Arizona, Andrew Leeroy STRUTHERS, Respondent.**

No. SB–93–0035–D.

Disc. Comm. Nos. 90–1272, 90–1323, 90–1450, 90–1757, 90–1785, 90–1830, 90–1863, 91–0301, 91–0310, 91–0375, 91–0386, 91–0416, 91–0528, 91–0631, 91–0707, 91–0884, 91–0926, 91–0949, 91–0966, 91–0967, 91–0982, 91–1058, 91–1072, 91–1089, 91–1188, 91–1278, 91–1314 and 91–1497.

Supreme Court of Arizona,
En Banc.

July 12, 1994.

State Bar of Arizona by Yigael M. Cohen, Allen B. Shayo, Phoenix, for State Bar of Arizona.

Andrew L. Struthers, pro se.

## OPINION

FELDMAN, Chief Justice.

The matter of Andrew Leeroy Struthers ("Struthers") first came before this court on April 26, 1991, when the State Bar of Arizona (the "Bar") filed a motion seeking Struthers' interim suspension, pending resolution of complaints against him. *See* Ariz.R.Sup.Ct. (hereinafter "Rule ___") 52(c)(2). We directed the superior court to conduct a hearing into those allegations. Rule 52(c)(6). Based on the court's findings of fact and conclusions of law, we ordered Struthers' interim suspension on June 13, 1991.

A hearing committee (the "Committee") later concluded that Struthers committed 143 violations of the Rules of Professional Conduct (Rule 42) and other rules of this court, and recommended Struthers' disbarment. The Disciplinary Commission (the "Commission") unanimously adopted the Committee's findings and recommendation. Struthers filed an appeal in this court opposing disbarment. We have jurisdiction to decide this matter pursuant to Rule 53(e) and Ariz. Const. art. 6, § 5(3).

## FACTS

Child Support Collections ("CSC"), a debt collection agency, retained Struthers in December 1989 to work with another lawyer who had been handling CSC's cases. The following day, the first lawyer resigned. Struthers took over her pending cases. CSC specialized in collecting overdue child support payments from divorced parents. The agency typically started its collection efforts with letters and telephone calls to the debtor. If these tactics failed, the agency turned over the accounts to the attorney. CSC worked on a contingency fee basis, retaining as its fee twenty percent of any amounts collected.

When Struthers started with CSC, the agency was owned by Robert Hydrick and run in large measure by John Star, neither of whom was an attorney. Shortly after joining CSC, Struthers sent letters to its clients, notifying them that CSC's previous lawyer had resigned and that their files had been assigned to him. These letters also stated that each client's existing agreement with CSC would be "honored in full."

In January 1990, at Struthers' suggestion, Hydrick dissolved CSC. This occurred during an investigation by the State Banking Department into allegations of irregularities in CSC's handling of client funds and that Star was falsely holding himself out as an attorney. Struthers knew about and even represented Star and Hydrick in these matters.[1]

When Hydrick dissolved CSC, Struthers superficially converted its operations into a law practice. In reality, however, CSC simply continued to operate. Star and Hydrick formed a new entity called MIROVI Inc., which was supposed to act as a managing company, providing support personnel and services for Struthers' practice. Star and Hydrick became Struthers' "legal assistants."

Many clients were subsequently required to sign new agreements raising the fee to twenty-five percent of funds collected. The new agreement also called for a small retainer fee and specified that Struthers would receive any court-awarded attorneys' fees in addition to—and not applied to—the retainer and his contingency fee.

From the beginning of Struthers' association with CSC, he had a very large case load. At first he took over from his predecessor about 250 cases, but this number later rose to nearly 750. Although Struthers nominally maintained his status as an independent attorney, CSC (now MIROVI) staff ran his office, his accounting system, and performed

---

1. The Banking Department subsequently issued two Cease and Desist Orders. One directed John Star to cease acting as a collection agent until he obtained a license. The other ordered Hydrick to comply with certain trust account obligations.

other tasks, such as conducting client interviews. Star and Hydrick performed essentially the same functions as they had in CSC. Under these circumstances, many of the formalities of a law firm were abandoned, giving rise to a number of the violations discussed below.

## DISCUSSION

In disciplinary proceedings, this court is an independent trier of both fact and law. *In re Castro*, 164 Ariz. 428, 429, 793 P.2d 1095, 1096 (1990). However, due to the large number of violations in this case, it is impractical to discuss each act charged as a violation. Rather, we follow the Commission's findings and address only those acts and charges that warrant discussion.

The Committee, whose findings the Commission adopted, concluded that Struthers committed the following violations of the Rules of the Supreme Court and the Ethical Rules ("ER") of the Code of Professional Conduct:

| | Number of Violations |
|---|---|
| Trust account violations (Rules 43 and 44) | 31 |
| ER 1.2 (scope of representation) | 1 |
| ER 1.3 (diligence) | 10 |
| ER 1.4 (communication) | 26 |
| ER 1.5 (fees) | 25 |
| ER 1.15 (safekeeping property) | 26 |
| ER 1.16 (terminating representation) | 1 |
| ER 5.3 (nonlawyer assistants) | 14 |
| ER 5.4 (professional independence) | 1 |
| ER 8.1 and Rule 51 (disciplinary investigations) | 8 |

We examine in detail some of the more egregious violations. For ease of discussion, we address them in four categories: (A) nonlawyer assistants; (B) improper fees and mishandling of client funds; (C) client contact and communications; and (D) the Bar investigation.

### A. Responsibilities regarding nonlawyer assistants

It is important to note that lawyers are often responsible for the actions of their nonlawyer assistants. Ethical Rule 5.3(a) provides that a lawyer in Struthers' position shall "make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance" that nonlawyer assistants conduct themselves according to the rules for lawyers. In addition, ER 5.3(c) holds a lawyer responsible for an employee's misconduct if the lawyer ratifies that conduct or fails to mitigate its consequences when possible.

In the present case, however, Struthers virtually abandoned responsibility for running his office to Star and Hydrick. Although Struthers knew the Banking Department had charged Star and Hydrick with serious improprieties, he gave them total control of his office and unfettered access to his trust fund. He exercised no oversight, but now argues that he "had no indication of dishonesty on the part of Mr. Hydrick or Mr. Star, only that their record keeping was not adequate." We reject this argument, as did the Commission, on both a factual and a legal basis.

Struthers' argument is factually flawed because his own admissions prove he knew about Star's dishonesty early in their relationship. Struthers admitted to the Committee that although Star told him he was an attorney licensed in other states, Struthers knew from the start this was not true. He also admitted he was physically afraid of Star. Given these facts, in conjunction with the charges brought before the Banking Department, Struthers did not meet his obligation to ensure that his nonlawyer assistants complied with his professional obligations. ER 5.3(b) and Comment thereto. Although there may often be some question of what is a reasonable effort to ensure proper conduct by nonlawyer employees, at a minimum the lawyer must screen, instruct, and supervise. *In re Galbasini*, 163 Ariz. 120, 124, 786 P.2d 971, 975 (1990). Struthers did little but close his eyes.

Moreover, even if Struthers had been unaware that he placed untrustworthy persons in charge of his affairs, he still violated ER 5.3(c) by knowingly ratifying many of their ethical lapses and by failing to mitigate their consequences. For example, although he knew Hydrick had commingled his own funds with those in Struthers' trust account, Struthers did nothing to stop this.

Struthers' conduct also violated Rule 43, which requires lawyers to maintain trust accounts according to certain accounting

guidelines. In relevant part, these guidelines require that:

b. Employees and others assisting the attorneys in the performance of [trust account duties] must be competent and properly supervised.

c. Internal controls within the lawyer's office must be adequate under the circumstances to safeguard funds or other property held in trust.

d. All transactions must be recorded promptly and completely.

Rule 43, State Bar of Arizona Trust Account Guidelines (1) (rev. May 1, 1984).

The Commission found that Struthers violated this rule "when he allowed incompetent and untrustworthy employees to manage his trust account, and then failed to properly supervise them to ensure they were complying with the Trust Account Guidelines." We agree. For example, Struthers routinely signed pages of blank checks for his employees to complete in his absence. As a result, Star and Hydrick were free to decide whether and how much to pay clients, and often based their decisions on which clients they favored.

In addition, many trust account checks were payable to "cash." Some were for as much as $1,900, with one $600 trust account check written to cover the living expenses of an employee's mother. Struthers' trust account was often overdrawn, in some months by as much as $20,000. Further, some clients were paid more from the trust account than had been deposited on their behalf. This occurred because Hydrick, with Struthers' knowledge, commingled his personal funds in the trust account to pay his former clients. Star also instructed employees to minimize the amount of money in the trust account to avoid paying interest to the Bar. *See* Rule 44(c)(2). In numerous instances, Struthers' employees kept no proper internal records for the trust account.

Struthers admits that for the first six months he was "lax" in monitoring his trust account. He tries to minimize this by pointing out that he eventually hired a certified public accountant to correct the trust account problems. He blames the subsequent problems on the accountant's failure to live up to her promises.

■ We find no excuse for the violations. First, even if the accountant had been successful, that would not excuse the violations in the first six months. Allowing unchecked control of an attorney's trust account by untrustworthy subordinates for six months is itself a serious breach of the rules. *Cf. Galbasini*, 163 Ariz. at 124, 786 P.2d at 975 (attorney has independent duty to supervise subordinates). Second, Struthers did not give the accountant sufficient independence and authority to solve the trust account problems. Rather, he placed her under Star's direct control. Star thwarted her ability to properly manage the account. Given Struthers' knowledge of Star, this should have come as no surprise. Finally, the accountant testified that she informed Struthers directly on more than one occasion that the trust account routinely had a negative balance. Under these circumstances, we conclude that the Bar has sufficiently proven the violations of Rule 43.

### B. Improper fees and mishandling of funds

The Committee and the Commission found that Struthers' fee arrangements and handling of client funds violated Rule 44 and ER 1.5, 1.15, and 5.4.

#### 1. Rule 44 and ER 1.15

■ The Commission found that Struthers violated Rule 44 in twenty-six instances. These charges stem mainly from the unusual contingency fee agreements Struthers employed. Many of Struthers' agreements with clients purported to allow Struthers to keep one hundred percent of all payments he collected until twenty-five percent of the total arrearage had been paid in full. Thus, for example, if a client's former spouse owed $10,000 in back child support, Struthers' fee was set from the beginning at $2,500, although it was contingent on actually being collected. If he succeeded in collecting any amount up to $2,500 from the former spouse, he kept it all, with the client getting nothing. Only after Struthers' fee was paid in full was the client, in Struthers' view, entitled to any of the child support the ex-spouse sent.

Some of the agreements that Struthers had clients sign contained two seemingly contradictory provisions. One said that his fee would be "25% of any and all amounts *received* on behalf of client" (emphasis added). The other stated that:

> Any amount of funds received will be applied first to Court Costs, then to Court awarded Attorneys' fees, and when these amounts are paid, the remainder of funds received *shall be paid to Attorney until the full amount of agreed to contingent fees is paid in full. . . .*

(Emphasis added.) These agreements also stated the contingency fee as a specific dollar amount equal to twenty-five percent of the entire unpaid child support owed the client.

Under Struthers' interpretation, these provisions meant that clients were not to be paid any of the child support monies collected until he himself received twenty-five percent of the full arrearages, plus all costs.[2] Thus, because many of the debtors never paid more than a small proportion of their arrearages, Struthers effectively retained one hundred percent of the money collected on those clients' behalf. Moreover, acting under this view of the agreement, Struthers did not notify clients when he received payments on their behalf but simply kept all monies until his fees and all costs were paid in full.

Rule 44(b) requires a lawyer to:

1. Promptly notify a client of the receipt of his funds, securities, or other properties.

\* \* \* \* \* \*

3. Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his clients regarding them.

4. Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties which the client is entitled to receive.

The Commission determined that Struthers violated Rule 44 "when he failed to notify clients immediately upon receipt of their funds, failed to promptly deliver client funds, failed to ensure that accurate trust account records were kept, and failed to ensure that client funds were deposited in his trust account." Similarly, the Commission concluded that Struthers violated ER 1.15 in twenty-six instances "when he failed to notify clients of his receipt of payments on their behalf, and failed to deposit those payments and maintain them in his trust account."

Struthers argues that because his fee agreement allowed him to keep all monies paid to his clients until his fee—twenty-five percent of the entire debt—was paid, he had no obligation to notify clients that he received payments because "the client had no interest in funds received on their behalf until such time as the contingent fee had been paid in full." In other words, Struthers would have us conclude that all money collected on his clients' behalf belonged to him the moment he received it, and thus created no obligations under Rule 44. We disagree, to put it mildly.

Even if Struthers' interpretation that all first monies belonged to him were correct, the clients had a sufficient interest in these funds to warrant notification of their receipt and an accounting of their use. These funds usually originated as child support payments by an ex-spouse to one of Struthers' clients. As such, the funds belonged, at least initially, to the client and only became fees when distributed to Struthers according to the contingency fee agreement. This distribution itself necessitated client notification and an accounting, even if one hundred percent of the received funds were allocated to attorney's fees. *Cf. In re Lochow*, 469 N.W.2d 91, 98 (Minn.1991) (retainer received for future services may only be withdrawn from trust fund after client has been given notice and an accounting).

The Trust Account Guidelines of Rule 43 also recognize this fact. Guideline 2(a) states that a lawyer shall render timely reports disclosing the status of "any trust assets held for the client, including *any final distribu-*

---

2. *These agreements could be interpreted differently. Moreover, other agreements were phrased in other ways. Following long-established principle, we evaluate Struthers' conduct* using the interpretation he willingly adopted in dealing with his clients and this court. *See Matthew* 26:52 (King James).

*tion of such assets.*" (Emphasis added.) *See also Castro,* 164 Ariz. at 430–31, 793 P.2d at 1097–98 (discussing failure of attorney to account for payments made by client). Therefore, Struthers' failure to notify clients of receipt and to account for these funds violated Rule 44, even if, as he claims, the money was his, a proposition with which the Committee and the Commission strongly—and properly—disagreed.

### 2. ER 1.5

The Commission concluded that Struthers' conduct resulted in twenty-five violations of ER 1.5. Many of these violations resulted from specific acts, such as failing to convey a written contingency fee agreement to a client and charging contingency fees that were unreasonably high in relation to the amount of work performed. *See In re Swartz,* 141 Ariz. 266, 274, 686 P.2d 1236, 1244 (1984).

Struthers also represented some clients without written fee agreements and charged some clients on an hourly basis although the clients had agreed only to a contingency fee. Obviously, these practices violated ER 1.5(c). We agree with the Commission's conclusions on this point, mentioning them only summarily, and turn to the more important issue.

■ One violation of ER 1.5 particularly merits attention: the Commission's conclusion that Struthers' fee agreement was inherently improper. The Commission's finding focused on two particular aspects of the agreement. The first is the provision that Struthers retain any court-awarded attorney's fees in addition to his contingency fee. As the Commission noted, this allowed for double recovery of fees.[3]

Such an arrangement would tend to mislead the awarding court as to Struthers' fee agreement, because a court would not award attorney's fees if it knew that the award would result in double recovery for the attorney and no benefit to the client. The purpose of awarding fees to a successful litigant is not to provide the lawyer with a double payment bonus but to defray the client's litigation expenses. *See, e.g.,* A.R.S. § 12–341.01(B) (award of reasonable attorney's fees in a contract case is "to mitigate the burden of the expense of litigation to establish a just claim or a just defense"). Although Struthers argues that he never used the provision, we hold that it is not reasonable and is facially improper as a violation of ER 1.5(a). *See, e.g., In re Douglas,* 158 Ariz. 516, 523, 764 P.2d 1, 8 (1988) (double billing for legal fees violated earlier ethical rule that was the equivalent of ER 1.5). We believe, further, that its very inclusion in the fee agreement was inherently and seriously improper. *Swartz,* 141 Ariz. at 273, 686 P.2d at 1243 (clearly excessive fees are grounds for discipline).

■ The second improper aspect of the fee agreement was that it could be interpreted as allowing Struthers to keep all funds collected on a client's behalf until his pre-set fee was paid in full. Such a provision in child support cases is highly suspect. It withholds money from children who have already been without adequate support for a considerable period of time and who, in most cases, must have badly needed the money. It is unlikely that a client who fully understood such terms would have agreed to this arrangement, except when in desperate straits. We therefore believe this kind of provision is inherently suspect and is improper unless both parties fully understood and freely agreed to this arrangement. Such was not the case here.

First, Struthers' written agreements were ambiguous. For example, in the agreement quoted above, one section spoke of Struthers' fee as being a percentage of "amounts received," while another spoke of Struthers retaining all funds received on a client's behalf "until the amount of the contingent fee is paid in full." Yet another section stated the contingency fee as a specific dollar amount. In light of these conflicting provisions, we believe it was not sufficiently clear to the client whether Struthers' fee was to be twenty-five percent of the amount actually re-

---

3. While the provision as discussed above violated ER 1.5, Struthers' agreements went farther, potentially allowing Struthers to collect both the contingency fee and any court-awarded attorney's fee *from his client* if the client discharged Struthers.

ceived or twenty-five percent of the total arrearage.

Second, factors outside the written agreement tended to mislead the clients. Many of Struthers' clients were former CSC clients, and CSC based its fees only on funds actually received. Shortly after Struthers became associated with CSC, he mailed clients a letter saying that CSC's contract would be "honored in full." Thus, an unsuspecting client could easily have believed that, although the new agreement raised the fee from twenty to twenty-five percent, the fee would still be calculated on the amount actually paid rather than on the full arrearage.

Finally, Struthers' employees often misled clients into thinking that the fee would be a part of each payment Struthers collected, with the remainder going to the client. Moreover, in an open letter to his clients mailed in Spring 1991, Struthers stated, "We accept this case on a contingent fee basis, which means if we obtain money for you, we retain a *percentage* of it." (Emphasis added.) We do not believe Struthers' clients would have taken this to mean that Struthers was to keep one hundred percent of the payments until his fee was paid in full.

In sum, we agree with the Commission's conclusion that Struthers' fee agreements violated ER 1.5. Insofar as they allowed double payment of fees, the fees were unreasonable and thus in violation of ER 1.5(a). Insofar as they purported to allow Struthers to retain all monies until his fee was paid in full, the agreements did not state the method by which the fees would be calculated with sufficient clarity to satisfy ER 1.5(c).

 Before leaving the subject, however, we must mention the inherent overreaching of these agreements. While it is entirely possible for a lawyer to agree with a sophisticated client that the lawyer will receive a pre-set contingency fee and that all funds collected will be applied to the fee, that rule cannot possibly be applied in every case. What is good for General Motors is certainly not good for a needy parent seeking to recover overdue child support. This, indeed, was the typical client that Struthers represented. We have stated before and state again: "a fee agreement between lawyer and client is not an ordinary business contract." *Swartz*, 141 Ariz. at 273, 686 P.2d at 1243. Although the lawyer is certainly free to consider his own interests, the primary concerns are those of the client. Fees must be reasonably proportional to the services rendered and to the situation presented. *Id.*

Given the financial situation of Struthers' clients, a provision entitling him to keep for himself all of the monies collected when, in many of the cases, it was to be expected that there would be no further recoveries for some time, if ever, is so clearly unfair to the clients that we find it overreaching as a matter of law. We condemn and will not tolerate such practices. The license to practice law gives a lawyer both the ability and the obligation to help the disadvantaged. It is not a tool to be used to prey on those most in need of the lawyer's help. For this reason, too, we hold the agreement violated the reasonable fee provisions of ER 1.5(a).[4]

### 3. ER 5.4

 Ethical Rule 5.4(a) provides that a "lawyer ... shall not share legal fees with a nonlawyer...." Struthers' agreement with MIROVI, however, required him to turn over all fees that he received to MIROVI, with any profit left after paying expenses to be "distributed by agreement of the parties." The Commission concluded that this conduct violated ER 5.4.

Struthers apparently concedes that this amounted to fee splitting with nonlawyers, but argues:

> port arrearages, either because attorneys should have an incentive to help those not receiving support (*see* Tamar Lewin, *Child-support Bounty Hunters a Sign of 'Broken System'*, ARIZONA DAILY STAR, May 30, 1994, at A1) or because collection of past due support is not a "domestic relations matter." *See* State Bar of Arizona Ethics Opinion No. 93–04 (March 27, 1993).

4. We note that ER 1.5(d), in relevant part, states: "A lawyer shall not enter into an arrangement for, charge, or collect: (1) any fee in a domestic relations matter, the payment or amount of which is contingent upon ... the amount of ... support...." However, the Bar, the Committee, and the Commission apparently believe that ER 1.5(d) does not apply to lawyers pursuing sup-

Respondent is of the opinion that had one additional step been in place, there would have been no perceived violation of this ER. Monies due Respondent were directly transferred to a MIROVI account from Respondent's trust account. Had Respondent transferred funds from his trust account to his operating account and then transferred funds from his operating account to the MIROVI account, all would have been in order.

Respondent's Opening Brief at 28. Struthers also points out that the monies transferred to MIROVI did not fully cover his office expenses.

Struthers' argument is both incorrect and irrelevant. It is incorrect because merely transferring all fees into an operating account before conveying them in bulk to a nonlawyer would not have prevented the arrangement from being a fee-splitting arrangement. For example, if the creditor had been a plumber instead of MIROVI, it would have been proper upon transferring fees from the trust account to an operating account to then pay the plumber's bill for specific services rendered. However, it would be improper for a lawyer to agree to simply transfer all of the lawyer's fees to the plumber and then split what remained after paying costs. *Peterson v. Anderson,* 155 Ariz. 108, 111, 745 P.2d 166, 169 (Ct.App.1987) (fee-splitting agreements with nonlawyers are contrary to public policy and unenforceable). This is what Struthers did with MIROVI.

Moreover, Struthers' argument is irrelevant. The contemplated steps were not taken in the present case, and the Commission was correct in finding that the agreement violated ER 5.4.

## C. Client contacts and communications

Struthers and his staff engaged in numerous acts that violated ER 1.3, 1.4, and 1.16.

### 1. ER 1.3 and 1.4

■ The Committee found that Struthers committed ten violations of ER 1.3, which requires a lawyer to "act with reasonable diligence and promptness in representing a client." Examples of Struthers' violations of ER 1.3 abound, including failure to promptly notify clients when he received funds on their behalf, to promptly pay clients, and to consult with a client regarding what demands to make in a petition for an arrearage judgment. He also delayed in responding to clients' inquiries, in giving clients access to their files on request, and in preparing and filing paperwork. His office failed in some cases to return telephone calls from clients, and sometimes gave false excuses for not paying clients. We believe the Commission correctly found that these and other acts violated ER 1.3. *In re Bowen,* 178 Ariz. 283, 872 P.2d 1235 (1994).

The Commission also found twenty-six instances in which Struthers violated ER 1.4, which requires an attorney to "keep a client reasonably informed about the status of a matter, and promptly comply with reasonable requests for information." The facts amply support these findings. Struthers admits that some clients' requests for information were neglected. He states in his brief to this court that although he directed his staff to give the desired information, he accepts full responsibility for their failure to do so. He notes further that although such delays did occur, he did not delay the clients' court cases.

We accept Struthers' admission of responsibility for these violations. We note, however, that it is no excuse that he overburdened himself with so many cases that he was unable to properly supervise his employees.

### 2. ER 1.16

■ The Commission found that Struthers violated ER 1.16(d) in one instance "when, after one client terminated his representation, he refused the client and her new attorney access to her file."

Ethical Rule 1.16(d) provides:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... surrendering papers and property to which the client is entitled.... The lawyer may retain papers relating to the client to the extent permitted by other law.

Struthers takes contradictory positions regarding this charge. He admits in one section of his brief that he violated this rule but in another he argues:

It is quite clear in the case law of Arizona that an attorney has lien rights in the file of a client in order to secure payment for fees. Under the fee agreement this client executed, there were fees due upon the termination of representation prior to the successful ·conclusion of the matter. Respondent attempted to negotiate these fees and costs due, but the client and her new counsel refused to address this issue.

Respondent's Opening Brief at 25. Whether an attorney can use a claim of lien rights to the client's detriment is a difficult subject. *See National Sales & Serv. Co. v. Superior Court*, 136 Ariz. 544, 547–48, 667 P.2d 738, 741–42 (1983) (Feldman, J., specially concurring). We need not, however, address the issue.

In the disputed instance, the agreement between Struthers and the client provided that the total contingency fee for successful completion of the matter would be $500, "which amount shall be due and payable to Attorney should client desire to cease representation by Attorney." The Commission found, however, that Struthers' assistant orally misrepresented the agreement's terms to the client. He told her the fee would be twenty-five percent of all monies received, plus costs and a $100 retainer.

Respondent collected a total of $513 for the client before she terminated the representation. None of this money was disbursed to the client, although some disbursements were made for costs.

Based on our previous discussion, we believe that the term purporting to set Struthers' fee was inherently improper and thus invalid. In addition, Struthers drafted the agreement in an ambiguous way, and it should have been construed against him. Moreover, Struthers' assistant made oral misrepresentations to the client, which would raise an estoppel issue. Under these circumstances, we believe that Struthers collected more than a fair fee and thus had no lien and no arguable right to retain the client's file. We therefore agree with the Commission that he violated ER 1.16.

## D. Other matters concerning the State Bar investigation

The Commission found that Struthers committed other rule violations. We conclude that the Bar adequately proved its allegations and need not discuss them at length. We turn instead to Struthers' claims.

In addition to his arguments on the specific charges, Struthers faults the Bar in three respects regarding its conduct during this investigation. Two of his arguments are that the Committee violated Rule 53(c)(4) by taking seventy-eight days to file its report, rather than sixty days, and that the Bar violated Rule 61(a) by giving an interview to a newspaper on Struthers' case. We do not consider it necessary to address these contentions because, even if true, neither allegation explains or mitigates Struthers' conduct.

The allegation that could have some bearing on this case is that Struthers requested the Bar's advice on two of the major issues during the investigation of this case. In October 1990, Struthers asked the Bar to render an ethics opinion regarding the propriety of his fee agreements and his financial dealings with MIROVI. Struthers argues that, had the Bar given him such an opinion, he could have corrected or mitigated his violations before discipline was imposed.

However, Struthers' request for information came only after he had used the agreements for some time and had already committed numerous violations. It also came only after several clients complained to the Bar. Moreover, although Bar counsel was without power to render a formal opinion, Struthers admitted under oath that Bar counsel informed him that the fee agreements might violate the Rules of Professional Conduct. Even so, Struthers continued to use the agreements. We therefore conclude that Struthers' argument is meritless.

## E. Sanction

Struthers argues that he should not be disbarred for the violations discussed above, although he admits that many of them did, in fact, occur. He contends that his rule violations were unintentional and that, because he has already been suspended for a

long period of time, disbarment would serve no further purpose. He claims that if allowed to practice law again, he would be "in no position to bring any harm to the public."

 We disagree. Professional discipline protects the public, the legal profession, and the justice system and deters other lawyers from engaging in like conduct. *In re Neville,* 147 Ariz. 106, 116, 708 P.2d 1297, 1307 (1985); *Swartz,* 141 Ariz. at 277, 686 P.2d at 1247. We believe that a lawyer who flagrantly disregards the Rules of Professional Conduct, as Struthers did, is a continuing and significant danger to the public.

In determining what sanction is appropriate in a professional discipline case, this court generally looks to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) ("*Standards*"); *In re Tarletz,* 163 Ariz. 548, 554, 789 P.2d 1049, 1055 (1990). Also, we often consult similar cases in an attempt to assess proportionality. *In re Levine,* 174 Ariz. 146, 174–75, 847 P.2d 1093, 1121–22 (1993).

In most cases, consideration of the *Standards* and the sanctions imposed in similar cases is necessary to preserve some degree of proportionality, ensure that the sanction fits the offense, and avoid discipline by whim or caprice. *Standards,* § 3.0. This case, however, is somewhat different. We deal here with a lawyer who, by premeditated scheme, has demonstrated that his practice is not designed to serve the public but, rather, to prey on those most in need of his help. He has demonstrated that he is indeed a danger to the public. To allow him to resume active practice would be to ignore our obligation to that public.

## CONCLUSION

Accordingly, Andrew Leeroy Struthers is disbarred, effective on the date this opinion is filed. In addition, he is assessed the costs incurred by the State Bar of Arizona in the sum of $17,215.51.

MOELLER, V.C.J., and CORCORAN, ZLAKET and MARTONE, JJ., concur.