#30782-aff in pt & rev in pt-JMK
**2026 S.D. 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

SEAMUS CULHANE, TURBAK LAW
OFFICE, P.C., THOMAS DICKSON and
DICKSON LAW OFFICE,                                    Plaintiffs and Appellees,

v.

BILL THOVSON,                                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

MICHAEL L. GUST of
ABST Law, P.C.
Fargo, North Dakota

MARK A. SCHWAB of
Schwab, Thompson & Frisk
West Fargo, North Dakota                          Attorneys for defendant and
                                                              appellant.

* * * *

ARGUED
MARCH 26, 2025
OPINION FILED **04/15/26**

* * * *

NANCY J. TURBAK BERRY of
Turbak Law Office, P.C.
Watertown, South Dakota

CHRIS ANGELL
RICHARD J. THOMAS of
Burke & Thomas PLLP
Arden Hills, Minnesota                    Attorneys for plaintiffs and
                                          appellees.

#30782

KERN, Retired Justice

[¶1.]    Bill Thovson, a South Dakota resident, contacted attorney Seamus Culhane, a South Dakota attorney, following the tragic death of Thovson's wife, Paula, as a result of a car accident in North Dakota on July 28, 2020.  Culhane agreed to represent Thovson and his minor daughter in relation to Paula's death and the parties signed a legal services agreement establishing a one-third contingent fee.  Shortly thereafter, Culhane recruited Thomas Dickson, a North Dakota trial attorney, to assist.  The parties signed a second legal services agreement establishing that the one-third contingent fee would be split equally between Culhane and Dickson (collectively Attorneys).  Both agreements permitted Attorneys to withdraw from representation and file a lien for the full amount of their contingent fee in the event that Thovson refused to accept a settlement offer that Attorneys considered reasonable.

[¶2.]    Within one month of Paula's death, the at-fault driver's and vehicle owner's insurer tendered the policy limits on both policies for a total of $500,000.  With the hope of recovering a larger sum, Attorneys and Thovson continued to look for additional assets and potential sources of recovery but were ultimately unsuccessful.  Attorneys advised Thovson in November 2020 that settlement was the best option.  Thovson declined to accept the settlement at that time.  Attorneys provided notice of their withdrawal in January 2021 and filed an attorney's lien in the amount of $170,049.81 representing one-third of the $500,000 settlement offer, plus costs.  Eighteen months later, in July 2022, Thovson accepted the insurer's settlement offer and Attorneys brought suit against Thovson, seeking a declaratory

-1-

judgment enforcing their attorney's lien and alleging breach of contract. Thovson counterclaimed for fraud, recission, breach of fiduciary duty, breach of contract, and deceit, relying in part on North Dakota law.

[¶3.] Following discovery, the parties filed cross-motions for summary judgment. The circuit court granted Attorneys' motion for summary judgment on their claims and ordered Thovson to pay Attorneys' fees and costs plus $31,303.59 in prejudgment interest. The court also granted Attorneys' motion for summary judgment on Thovson's counterclaims, which were dismissed. Further, the court held that North Dakota law did not apply, but that even if it did, Thovson failed to provide notice of recission within the statutory timeframe required under North Dakota law in order to void the agreement. Thovson appeals. We affirm in part, reverse in part, and remand for a determination of Attorneys' reasonable fees based on quantum meruit.

## Factual and Procedural Background

[¶4.] Paula Thovson was killed in a car accident on July 28, 2020, in North Dakota. The at-fault driver, Dean Johs, was westbound on a North Dakota highway, driving a truck pulling a gooseneck trailer loaded with construction trusses and sheets of metal. Dean, who was under the influence of painkillers, was texting when he sped through a stop sign and drove through an intersection immediately in front of Paula, who was traveling southbound. Paula's vehicle T-boned Dean's truck behind the passenger-side rear axle. The forceful impact of the collision crushed Paula's vehicle pushing it westward and causing the trailer to separate from the truck, which rolled at least once before landing on its wheels in

the ditch. After being extricated from the vehicle, Paula was transported by air to Avera St. Luke's Hospital in Aberdeen where she died from her injuries. At the time of the collision, Paula was talking on the phone with her husband, Bill Thovson.

[¶5.] On August 4, 2020, the day after Paula's funeral, Thovson contacted Seamus Culhane with Turbak Law Offices, P.C., by text message. In the message, Thovson stated that he was referred to Culhane and asked Culhane if he would "be interested in representing me on my wife's . . . fatal automobile crash[.]" Thovson expressed concern about "evidence disappearing in this critical personal injury case." Culhane agreed to start looking into the case and asked that Thovson send the police reports. The following morning, Thovson e-mailed Culhane screenshots of text messages between Thovson and Trooper Paul Sova with the North Dakota Highway Patrol (NDHP). Thovson stated that the NDHP released the vehicles and trailer the previous day and gave Culhane the name of the body shop where the vehicles were being held.

[¶6.] Lisa Ronke, a paralegal with Turbak Law, contacted Trooper Sova on August 5 and was informed that he had finished his report and that the vehicles had been released. Trooper Sova stated that a criminal investigation was underway, and that the incident was considered a homicide. He also stated that the "stop sign was clearly blown." Ronke called the body shop where the vehicles were being held and spoke to Steve Ost, the shop's owner, who provided the insurance information for the truck and trailer. She told Ost that he would be receiving an anti-spoliation letter and asked that he preserve all evidence relating to the

accident. Ronke also learned that there was a convenience store on the corner near the scene of the collision that had a video of the collision.

[¶7.] Ronke contacted the convenience store manager, Paul Ostendorf, and learned that Ostendorf gave a copy of the video to the NDHP. Ronke asked him to preserve his copy of the video and informed him that he would be receiving an anti-spoliation letter. Ostendorf stated that he did not see the collision, but he heard it and immediately ran to Paula's vehicle, but it was "beyond anything [he] could do to help." Hours after the collision, Ostendorf helped clear the debris from the accident and reload the items on the trailer. Ostendorf stated that the trailer was loaded with trusses and steel for a pole barn.

[¶8.] Culhane sent an e-mail to Thovson on August 6, 2020, updating him on the work that had been done thus far. He explained that Ronke contacted and spoke with witnesses and learned that "there is likely video at the c-store near the collision." Culhane also informed Thovson that he had arranged to have the vehicles inspected and that he was looking for more information about Dean Johs. Additionally, Culhane stated that he was trying to discover where the truss load originated from and its destination in order to determine if additional parties could potentially be liable.

[¶9.] As promised, Culhane sent four anti-spoliation letters on August 6 to Ostendorf, Ost, Dean Johs, and Charles Johs, Dean's father and the owner of the truck. Culhane also contacted Thomas Dickson, an attorney in North Dakota, to seek his assistance on the case. Culhane met with Thovson in person on August 7 when they executed a legal services agreement (LSA 1). Under the terms of the

agreement, Culhane agreed to represent Thovson in relation to Paula's death on a 33.33% contingent-fee basis. Prior to signing, Thovson requested that Culhane adjust the fee provision such that advanced costs would be paid out of the gross recovery and the one-third contingent fee would be calculated based only on the net recovery.[1] Thovson also requested that a provision regarding structured settlements be removed. Culhane accepted both requests and adjusted LSA 1 accordingly. Relevant to this appeal, LSA 1 included the following provision:

> It is the right and responsibility of the client to decide whether or not to accept any settlement offer. If the client refuses to accept an offer that is, in the opinion of Turbak Law Office, P.C., fair and reasonable, Turbak Law Office, P.C. has the right to withdraw from representation of the client on the matter and retain a lien against the claim for costs incurred in pursuit of the claim and for fees equal to 33.33% (1/3) of that offer, less costs.

[¶10.] On August 8, Culhane informed Thovson that he intended to involve Dickson in the case and that Turbak Law would split its fees with Dickson, so Thovson would incur no additional cost. Thovson responded, "Sounds good and I trust your judgment." From this point, Culhane and Dickson worked together on the matter.

[¶11.] Culhane contacted National Farmers Union Property and Casualty Company (Farmers Union), the insurer for Dean and Charles. By August 18,

---

1.  At the time LSA 1 was signed, Thovson and Culhane knew that Thovson had $100,000 in underinsured/uninsured motorist coverage under his own auto insurance policy, but it was unknown whether any additional insurance coverage existed. Thovson was concerned that if his recovery was limited to $100,000, very little would remain after the deduction of medical expenses, advanced costs, and attorney fees. This concern prompted him to request that advanced costs be taken "off the top" before the contingent fee was calculated.

Attorneys learned that Dean and Charles were separately insured by Farmers Union, but Farmers Union had not yet received permission to disclose its insureds' policy limits. Attorneys also looked into the no-fault personal injury protection coverage (med pay benefits) under Thovson's insurance policy and learned that it was significantly less than the $30,000 minimum required under North Dakota law. Attorneys contacted a representative from Thovson's insurance company who agreed that the $30,000 minimum applied and issued a check to Thovson for that amount.

[¶12.] On August 24, 2020, Farmers Union contacted Turbak Law and offered the $250,000 limit of Charles's policy in settlement for all claims against Charles. Culhane notified Thovson of the offer the same day and speculated that Dean would have an additional $250,000 of coverage. Culhane told Thovson, "It looks to me like the final gross number is likely to be around $535,000. Its [sic] possible that we will find more coverage, however, it is pretty unlikely."

[¶13.] On August 25, Turbak Law e-mailed Thovson a revised legal services agreement (LSA 2) that included a provision specifying that the contingent fee would be split equally between Turbak Law and Dickson. Thovson responded with minor alterations, none of which impacted the withdrawal provision contained in LSA 1, which Culhane accepted.

[¶14.] On August 26, Farmers Union informed Culhane that Dean's policy limit was $250,000 and offered that amount in settlement of all claims against Dean. They attached a signed affidavit in which Dean swore he had no other

insurance providing coverage for the collision.  Later that day, Farmers Union's attorney, Brad Beehler, e-mailed a release of claims agreement to Culhane.

[¶15.]     On August 27, Thovson signed and returned LSA 2.  On August 31, Culhane informed Thovson that Farmers Union offered the $250,000 limit of Dean's policy.  Culhane also told Thovson that he and Dickson were still trying to determine whether any other insurance coverage existed.  He informed Thovson that they were in contact with Thovson's insurer to convince it to waive its right to reimbursement for the $30,000 "med pay" benefits it paid under his automobile insurance policy.  Later, Thovson's insurer agreed to waive its claim for recovery of these funds.

[¶16.]     On September 1, 2020, Farmers Union provided Attorneys with the policy declaration for Charles's commercial general liability (CGL) policy.  The next day, Culhane contacted Thovson and told him that the insurance was likely going to be limited to $500,000.  Culhane noted that the CGL policy had "some unusual aspects" but "pretty clearly indicates that there is no liability coverage on the trailer, one of the more common places we would find additional coverages." Regarding the Johs' personal assets, Culhane told Thovson: "It's my impression that most assets were not free and clear, and having hundreds of these [kinds] of deals, this one doesn't appear at face value to be one where there will be adequate personal assets to justify the necessary litigation to get into accessing those." Thovson responded:

> It sure seems that we need to do more work on the possible
> insurance coverage associated with the trailer, as we would not
> be conversing had it not been for the trailer, and it seems that
> we have time to do that since we are also awaiting the outcome

of the products being hauled and the potential liability therein. . . . Given my research and personal and professional connections, Seamus, I'm not sure that I agree with your conclusions regarding available assets. Time will tell but, in the meantime, I shall continue employing my experience in locating assets and Mr. Charles Johs['] financial capacity.

[¶17.] As the investigation continued, Charles refused to cooperate by allowing an inspection of the truck and trailer. Farmers Union was also less cooperative because it had already admitted liability and offered the policy limits. The parties learned several weeks after the accident that Charles had removed the trusses and metal from the trailer within days after the accident, and therefore, they could no longer inspect the load. On September 11, 2020, Culhane told Thovson, "I talked to [Dickson] yesterday and we decided that it will be best to start an action in Federal Court so as we may have a mechanism to discover what that guy was hauling, for whom, etc." However, after further investigation, Attorneys discovered that Dean was working for Charles's construction business, CD&R Construction, at the time of the accident and the trusses and metal were being hauled for Charles, although it was unclear whether they were for CD&R's use or for Charles's personal use.

[¶18.] Dickson spoke with the State's Attorney prosecuting the criminal matter against Dean on September 17 and learned that there was a taped interview of Dean where he stated that his right arm was in a sling from surgery, and he was adjusting the sling at the time of the crash. Dean also stated that he had taken pain medication that morning. The State's Attorney stated that the trailer was not carrying a big load and "the weight and the loading of the trusses and siding did not contribute to the accident."

[¶19.]     After continued investigation, it appeared that the load was being hauled for CD&R, but that CD&R was working as an independent contractor. Culhane notified Thovson of this on October 19 and stated that Dickson was still trying to speak to Charles to confirm "[b]ut, for all practical purposes, I would say we are looking at the $500,000 in total liability coverage." Thovson asked if they were still considering filing a federal action and stated:

> Also, since the defendant retained counsel, I'm assuming that [Dean] and/or [Charles] have some financial resource access. If I'm limited to a $500,000 liability claim in exchange for my wife's life, may I respectfully reiterate my suggestion that we pursue "a settlement" from the Johs for all of my out-of-pocket-costs including, but not limited to my attorney fees. Alternatively, if they don't want to play ball in that part, we pursue a civil claim for much more due to the wrongful death of my wife[,] for loss of companionship, pain and suffering, emotional distress, loss of consortium, loss of income and various other damages associated with the instrumental role that Paula served in my business.

Thovson also asked, "if only the insurance liability limits are achieved is there any possibility that attorney fees will be renegotiated[?]" Culhane explained that if Charles would cooperate and provide the information to confirm whether CD&R was working as an agent or independent contractor, there would not be a need to file a lawsuit.

[¶20.]     Dickson met with Charles and his attorney on November 13 in Fargo. Charles confirmed that Dean was hauling supplies for two different construction projects where CD&R was hired as the contractor. Based on this conversation, Dickson concluded, "[t]here will be no finding of [a]gency under North Dakota law. Mr. Johs was the contractor and handled on [sic] the details and oversight on the work." Culhane, Dickson, and Thovson met in person at Culhane's office on

November 20, 2020, to discuss the case. Following the meeting, Culhane sent the

following e-mail to Thovson:

> I am writing to memorialize our meeting today. We've agreed to attempt to obtain additional proceeds beyond the $500,000 in combined liability limits from Mr. Charles Johs. However, we all recognize the unlikely event that we will recover anything from him and we also recognize the fact that there is basically nothing to be gained from litigation. As such, you have preliminarily agreed to accept whatever the answer/response may be from Mr. Johs and release your claims after Mr. Dickson exercises what efforts he feels are appropriate and practical to obtain additional proceeds. In exchange for this agreement among us, Mr. Dickson and I have agreed to reduce our fees on the first $500,000 to 30% (rather than 33.33%), and otherwise eat the costs incurred to date[.] . . . Meanwhile, if there are additional proceeds beyond the $500,000 in liability limits, we will only charge you 17% on that amount of additional money recovered beyond the $500,000 that has already been offered[.] . . . Please let me know if we've misunderstood anything. I do not believe that we need an additional fee agreement, and given the limited time frame between our meeting and when I expect Mr. Dickson to meet/speak with Mr. Johs' attorney, this should suffice as a written agreement. As we previously discussed the services have been deemed to have been provided in ND, and Mr. Dickson's office and my office are splitting all attorneys' fees 50/50 and you are okay with that.

Thovson responded that he would review the e-mail in the coming days. The record

does not contain any indication that Thovson communicated to Attorneys that this

summary was inaccurate.

[¶21.] At Thovson's direction, Dickson spoke with Charles's attorney and

requested a personal contribution of $100,000 from Charles towards a settlement.

Charles's attorney replied on December 7 that Charles refused to contribute, which

was communicated to Thovson the following day. In this e-mail to Thovson,

Culhane stated, "Per our discussion and agreement, I expect [Dickson] to now tell

the insurance company that we will be accepting the offer(s) on your behalf and

provide instructions for the settlement check to be deposited into his trust account. You'll need to sign a release of any civil claims[.]" Thovson responded that he would "not agree to sign anything, at this time."

[¶22.]     On December 10, 2020, Culhane informed Thovson that if he did not agree to the settlement, Attorneys would exercise their right to withdraw pursuant to the withdrawal provision of their contract. Thovson expressed discontent that Dean and Charles would not be held financially responsible in their personal capacities for Paula's death. In response, Culhane reiterated that further efforts would not increase the amount ultimately recovered.

[¶23.]     On January 15, 2021, Culhane informed Thovson of his intent to file an attorney's lien and to notify the relevant parties of his withdrawal from the case.[2] Thovson replied, "Please know that should you elect to withdraw and file a

---

2.     Explaining the reasons for withdrawal, Attorneys stated:

> Pursuant to our agreement(s) that you signed on August 7th, 2020, and amended on August 27th, 2020, we obtained an offer that we believe to be fair and reasonable and you have refused to accept that offer and do what is necessary to complete the settlement. The agreement provided we would be allowed to withdraw from your representation and maintain a lien protecting our interests, which we have now done.
>
> In doing so, we have met the requirements of Rule 1.16 of the Rules of Professional [C]onduct, which allow our withdrawal in that we have done everything possible for you and cannot come to a more favorable nor better outcome for you. You are not prejudiced by our withdrawal in that there is nothing more that can reasonably be done and that the course of conduct that you have indicated a desire for involves requiring us to take action that we consider repugnant and have a fundamental disagreement with. . . .

(continued . . .)

lien, my plan is to move forward by rescinding the alleged contract for reasons to include, but not limited to fraudulent inducement." Culhane filed an attorney's lien on January 19, 2021, for $170,049.81.

[¶24.] Following their withdrawal, Dickson and Culhane communicated with Thovson sporadically. Dickson contacted Thovson on June 23, 2022, to inform him of the approaching two-year statute of limitations for wrongful death actions in North Dakota. Dickson and Culhane learned that Thovson was contemplating accepting the settlement offer from Farmers Union. Thovson e-mailed Dickson and Culhane on June 20, 2022, asking:

> What is the lowest amount you'll accept for not lifting one-finger before National Farmer Union Property Casualty Company offered to pay the full policy limits of $500,000 in less than 30-days (after my beloved wife was killed) . . . . Your settlement proposal should exclude the $5,556.92 of out-of-pocket costs that you have claimed, as I will reimburse that amount . . . regardless of whether I rescind the contingency contract or affirm it and sue for damages.

[¶25.] On July 19, 2022, Beehler informed Culhane and Dickson that Thovson reached an agreement with Farmers Union and accepted the $500,000 settlement offer. It does not appear from the record that Thovson retained new counsel to assist with the wrongful death action after Attorneys' withdrawal.

_____
(. . . continued)
> Meanwhile, you have failed to fulfill an obligation to us in consummating the release of all claims, as was discussed on November 20th, 2020 and memorialized in writing the same day. You failed in that you did not agree to release all claims and put this matter to rest once the Defense indicated they would not be willing to pay personally, beyond the proceeds of the insurance policies as was the deal, in exchange for reduced attorney's fees and costs.

Farmers Union issued a check for the amount of the attorney's lien made payable to Culhane, Turbak Law, Dickson, Dickson Law, and Thovson. Culhane asked Thovson to endorse the check and Thovson refused to do so. Culhane, Dickson, and their respective law offices filed suit against Thovson and Farmers Union on January 25, 2023, seeking a declaratory judgment that they were entitled to enforcement of their attorney's lien and for damages resulting from Thovson's breach of the LSAs. Thovson filed an answer and counterclaim on March 3, 2023. Regarding the allegations in the complaint, Thovson claimed that the fees were unreasonable. Thovson also counterclaimed for fraud, recission pursuant to N.D.C.C. §§ 9-08-08 and 9-08-09, breach of fiduciary duty, breach of contract, and deceit pursuant to SDCL 16-18-28. Farmers Union deposited the contested funds with the Codington County Clerk of Courts and was thereafter dismissed from the proceedings.

[¶26.] After engaging in discovery, on June 3, 2024, Attorneys filed a motion for summary judgment on their breach of contract claim. Attorneys claimed that the undisputed material facts established that Thovson breached LSA 1 and LSA 2 by refusing to endorse the settlement check from Farmers Union or otherwise pay the fees and costs owed under the contracts. They asserted that they were owed $181,211.53 in fees and costs and were entitled to prejudgment interest in the amount of $31,062.59, calculated beginning September 8, 2022, the date Thovson was asked to endorse the check.

[¶27.] Thovson also filed a motion for partial summary judgment on June 3, 2024, on Attorneys' claims and his counterclaim for recission under N.D.C.C. § 9-08-

09. In his accompanying brief, Thovson argued that North Dakota law, N.D.C.C. § 9-08-09, applied to this dispute. This statute provides that: "[a]ny person sustaining personal injuries, or in the case of the person's death, the person's personal representative, may elect at any time within six months after the date of such injury to avoid any settlement, adjustment, or contract made in connection therewith" within 30 days after the injury as prescribed by N.D.C.C. § 9-08-08 "by a notice in writing to that effect." N.D.C.C. § 9-08-09.

[¶28.] Thovson claimed that Attorneys' withdrawal from representation prior to the expiration of the six-month recission period "made it impossible for Thovson to exercise his statutory rights in compliance with North Dakota public policy," because the contract had terminated. Accordingly, Thovson asked the circuit court to deem LSA 1 and LSA 2 void. Thovson also asserted that Attorneys' breach of contract claim failed as a matter of law because the fees were unreasonable and because their withdrawal due to Thovson's refusal to accept a settlement offer was not for good cause, thereby precluding them from recovering their contingent fee.

[¶29.] Attorneys subsequently filed a motion for partial summary judgment on Thovson's counterclaims. They asserted that North Dakota law did not apply and, therefore, Thovson's claim for recission under N.D.C.C. §§ 9-08-08 and 9-08-09 failed as a matter of law. Alternatively, Attorneys asserted that if North Dakota law applied, Thovson failed to provide written notice of recission within six months of Paula's death as required by N.D.C.C. §§ 9-08-08 and 9-08-09.

[¶30.] Under South Dakota law, Attorneys argued that Thovson's claim for recission failed because he did not rescind promptly after discovering the facts

allegedly entitling him to rescind. They also asserted that his claim for actual fraud failed as a matter of law because the undisputed facts did not establish an intent to defraud or damages because the negotiated terms of LSA 2 placed Thovson in a better position than LSA 1, which Thovson did not claim was induced by fraud. Regarding Thovson's claim for deceit under SDCL 16-18-26(1), Attorneys asserted that the claim failed as a matter of law for lack of evidence of intent to deceive and resulting damages. Similarly, they claimed that Thovson's claims for breach of fiduciary duty and breach of contract failed for lack of evidence of breach and resulting damages.

[¶31.] The circuit court heard the motions on July 1, 2024. Attorneys argued that the case involved a simple breach of contract claim and asked the court to grant their motions for summary judgment. The court engaged in an extended exchange with Thovson's counsel regarding the ability of an attorney to withdraw and receive their fees after a client refuses to accept a settlement that the client ultimately accepts after withdrawal. The exchange culminated with the court's ruling that the one-third contingent fee on the net recovery was "a very reasonable fee in this kind of case" and that it was unreasonable for a client to challenge in hindsight the reasonableness of the fee or the Attorneys' ultimate decision that trial would not result in a higher recovery. The court determined that the contracts were not unconscionable and that there was no evidence that they were induced by fraud. Therefore, the circuit court granted Attorneys' motions for summary judgment and denied Thovson's motions.

[¶32.]     The circuit court entered its order on the summary judgment motions on July 19, 2024.  The court ordered that Attorneys be awarded $202,314.52, comprised of the one-third contingent fee, costs advanced, and prejudgment interest.[3]  Thovson appeals, raising numerous issues, which we revise and restate as follows:

> 1.     Whether the circuit court erred by applying South Dakota law.
>
> 2.     Whether the circuit court erred by granting Attorneys' motion for summary judgment and enforcing their attorney's lien.
>
> 3.     Whether the circuit court erred by granting Attorneys' motion for partial summary judgment resulting in the dismissal of Thovson's counterclaims.

**Analysis and Decision**

### 1.     *Whether the circuit court erred by applying South Dakota law.*

[¶33.]     The circuit court determined that North Dakota law was inapplicable to this matter and, therefore, Thovson was not entitled to rescind the LSAs under North Dakota law.  A circuit court's choice of law determination is a legal conclusion that we review de novo.  *Burhenn v. Dennis Supply Co.*, 2004 S.D. 91, ¶ 11, 685 N.W.2d 778, 782 (citation omitted).

[¶34.]     As an initial matter, we note that "parties may agree to be bound by the law of a particular state" through a choice of law provision in a contract.  *Dunes Hosp., L.L.C. v. Country Kitchen Int'l, Inc.*, 2001 S.D. 36, ¶ 10, 623 N.W.2d 484, 488

---

3.     The court awarded $164,494.54 in attorney fees, $6,516.39 in advanced costs, and $31,303.59 in prejudgment interest.

(citing *State ex rel Meierhenry v. Spiegel, Inc.*, 277 N.W.2d 298, 299 (S.D. 1979)).

*See also* Restatement (Second) Conflict of L. § 187 (1971) (generally "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied"). Here, neither LSA 1 nor LSA 2 contain such a choice of law provision manifesting the parties' intent to be bound by the laws of a particular jurisdiction, nor do the agreements indicate the place of performance. Accordingly, we must apply choice of law principles to determine which state's law applies.

[¶35.]     The parties disagree about the appropriate choice of law standard to apply. Thovson asserts that North Dakota law applies and that the determination is governed by SDCL 53-1-4, which provides:

> A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

Thovson argues that pursuant to this statute, North Dakota law applies because Attorneys and Thovson "all intended their agreements to be performed in North Dakota."

[¶36.]     Attorneys maintain that the choice of law is governed by the most significant relationship test first applied by the Court in *Chambers v. Dakotah Charter, Inc.*, 488 N.W.2d 63 (S.D. 1992). We explained in *Chambers* that under the most significant relationship test, we evaluate the relevant contacts with the forum, including: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* at 68 (quoting

Restatement (Second) of Conflict of L. § 145 (1971)). Attorneys maintain that under this test, South Dakota law applies because "[a]ll four contacts to be considered in determining which state had the most significant relationship to the occurrence and the parties favor applying South Dakota law."

[¶37.] We are not certain that either of the parties' positions are correct. SDCL 53-1-4 expressly relates to the law to be applied in *interpreting* a contract, and here, we are tasked with determining the *enforceability* or *validity* of the LSAs as written. Further, the most significant relationship test of the Restatement (Second) of Conflict of Laws § 145 that we applied in *Chambers* expressly applies in *tort* cases. *See* Restatement (Second) of Conflict of L. § 145 (setting forth the considerations to determine the "rights and liabilities of the parties *with respect to an issue in tort*" (emphasis added)).

[¶38.] While neither party cites to it, choice of law questions regarding *contracts*, including the validity thereof, are addressed in the Restatement (Second) of Conflict of Laws, §§ 186–207. *See* Restatement (Second) of Conflict of L. ch. 8, topic 1, title A, intro. note (1971) ("This Title states the general approach to be followed in determining choice-of-law questions *involving contracts*. Title B (§§ 189–197) deals with particular kinds of contracts, and Title C (§§ 198–207) with particular issues involving contracts." (emphasis added)). "Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188." Restatement (Second) of Conflict of L. § 186 (1971).

[¶39.]        Section 188 provides:

> In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account . . . to determine the law applicable to an issue include:
>
> (a) the place of contracting,
>
> (b) the place of negotiation of the contract,
>
> (c) the place of performance,
>
> (d) the location of the subject matter of the contract, and
>
> (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Restatement (Second) of Conflict of L. § 188(2) (1971).  Further, section 196 of the Restatement addresses the specific question of the validity of a contract and provides that the "validity of a contract for the rendition of services and the rights created thereby" are determined by "the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship."  Restatement (Second) of Conflict of L. § 196 (1971).[4]

[¶40.]        We conclude that whether SDCL 53-1-4 or sections 188 and 196 of the Restatement applies, the result is the same.  Under both SDCL 53-1-4 and the applicable Restatement sections, the Court must first consider (1) the place of performance and (2) the place of contracting, i.e., the place where the contract is made.

---

4.    The Court applied sections 188 and 196 of the Restatement in *Anderson v. Tri State Constr., LLC*, 2021 S.D. 50, ¶ 19 n.9, 964 N.W.2d 532, 539 n.9.

[¶41.]     Neither LSA 1 nor 2 indicates a place of performance.  LSA 1 does provide that "[t]he client agrees and acknowledges that for purposes of sales tax, all services rendered under this agreement are considered to have been received by the client at Turbak Law Office, P.C.'s office."  However, the provision is expressly limited to the location of services rendered for purposes of sales tax and was removed from LSA 2.  Regarding the scope of representation, the agreements broadly provide that Thovson "employs Turbak Law Office P.C. to represent the client and his minor child . . . in connection with any claim the client has against Dean Johs, any employer, any joint tortfeasor, or any insurer providing liability coverage for such claim, arising from the death of his wife Paula Thovson as a result of an automobile crash on 7/28/2020."

[¶42.]     Thovson, arguing for application of SDCL 53-1-4 and relying on *Briggs v. United Services Life Insurance Co.*, asserts that we can consider facts indicating the parties' *intentions* regarding the place of performance where there is not an express provision.  117 N.W.2d 804, 807 (S.D. 1962).  In *Briggs*, we stated that "[a] contract must be construed in accordance with the law of the place where made unless it is shown that it was the intention of the parties to be *bound by the law* of some other place."  *Id.* (emphasis added).  Accordingly, we determined in *Briggs* that because the intention was not known, the contract should be interpreted according to the laws of the place where it was made.  In *Green v. Clinic Masters, Inc.*, we applied the language from *Briggs* and looked to the parties' "intention to be bound by the laws of [another place]."  272 N.W.2d 813, 816 (S.D. 1978).  We determined that such an intention was manifested through a choice of law provision

which we upheld. Neither *Briggs* nor *Green* were resolved by determining where the contract would be performed. Accordingly, the language in *Briggs* relied on by Thovson is inapplicable here.

[¶43.] Because the parties did not include a choice of law provision or indicate the place of performance in their contract, we consider where the contract was made. *See* SDCL 53-1-4; Restatement (Second) of Conflict of L. § 188(2)(a) (1971). "The test of the place of a contract is the place where the last act is done by either of the parties which is necessary to complete the contract and give it validity." *Briggs*, 117 N.W.2d at 807.

[¶44.] Here, the last act necessary to give both LSAs effect was the signatures by the parties. LSA 1 was signed by Thovson and Culhane on August 7, 2020, at Turbak's office in Watertown, South Dakota. LSA 2 shows that Thovson signed on August 27 and both Culhane and Dickson signed on August 28. Because Culhane signed in South Dakota and Dickson signed in North Dakota, we must determine who signed first.

[¶45.] The reproduced e-mail logs attached to Culhane's affidavit filed with Attorneys' response to Thovson's statement of material facts shows the sequence of signing LSA 2. LSA 2 was signed by Thovson and sent to Turbak Law via e-mail on August 27 at 4:02 a.m. At 9:00 a.m., Culhane sent LSA 2 to Dickson with the message "LSA as signed by Bill Thovson" and followed up on August 28 at 8:58 a.m. asking "Did you sign and return that fee agreement?" At 9:23 a.m., Dickson responded, "[w]e are sending it this morning" and at 9:31 a.m., Bailee Vetter with

Dickson Law e-mailed Culhane, stating "Here you go, Seamus" and a description of the attachment as "*Attachment LSA signed by BT and TD*[.]"

[¶46.]    Culhane followed up with Dickson again at 1:50 p.m. to which Vetter responded informing Culhane that the signed agreement was sent earlier that morning and re-attached the signed document. At 1:54 p.m., Erica Fox with Turbak Law sent an e-mail to Culhane stating: "Printed for your signature." LSA 2 was signed thereafter by Culhane and dated August 28, 2020. The fully executed LSA was sent to Thovson on August 31, 2020. Thus, it is apparent that the last act necessary to complete the contract occurred in South Dakota when Culhane signed LSA 2, and the parties' contract is thus considered made in South Dakota.

[¶47.]    We also note that the parties to LSA 1—Thovson and Culhane—are both residents of South Dakota, although Dickson, a party to LSA 2 is a resident of North Dakota. *See* Restatement (Second) of Conflict of L. § 188(2)(e) (1971). However, the majority of services to be provided, and that were actually provided, were by Culhane and members of his law firm in South Dakota. *Cf.* Restatement (Second) of Conflict of L. § 196 (1971) (considering where the services or the majority of services are to be rendered).

[¶48.]    For all these reasons, we conclude that whether we apply SDCL 53-1-4 or sections 188 and 196 of the Restatement, the circuit court correctly determined that this matter is governed by South Dakota law.[5]

---

5.    The circuit court applied South Dakota law, but did not explain on what basis. Nevertheless, we can "affirm the ruling of the [circuit] court if it is 'right for any reason.'" *Gonzales v. Markland*, 2025 S.D. 14, ¶ 19, 18 N.W.3d 658, 667 (citation omitted).

### 2. Whether the circuit court erred when it granted Culhane's motion for summary judgment regarding his attorney fee lien.

[¶49.] "We review grants of summary judgment under the de novo standard of review." *Betty Jean Strom Tr. v. SCS Carbon Transport, LLC*, 2024 S.D. 48, ¶ 21, 11 N.W.3d 71, 81 (quoting *Bialota v. Lakota Lakes, LLC*, 2024 S.D. 7, ¶ 15, 3 N.W.3d 454, 459). "Summary judgment is only appropriate when the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits of the parties, reveal that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Id.* ¶ 21, 11 N.W.3d at 81–82 (quoting *McGee v. Spencer Quarries, Inc.*, 2023 S.D. 66, ¶ 18, 1 N.W.3d 614, 620).[6]

[¶50.] "This Court 'has inherent power to supervise the conduct of attorneys who are its officers.'" *In re Discipline of Ravnsborg*, 2024 S.D. 58, ¶ 23, 12 N.W.3d 306, 314 (quoting SDCL 16-19-20). Attorneys in this State are also "governed by the South Dakota Rules of Professional Conduct." *In re Discipline of Dorothy*, 2000 S.D. 23, ¶ 20, 605 N.W.2d 493, 498 (citing SDCL ch. 16-18 App.). There are several such Rules that bear on this issue. Rule 1.2 provides that "[a] lawyer shall abide by a client's decision whether to settle a matter" and Rule 1.5 prohibits lawyers from charging an unreasonable fee. SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.2; SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.5. The attorney's right or obligation to withdraw from representation is governed by Rule 1.16, which sets

---

6. Issue Three also involves our review of summary judgment and we apply these same standards of review to that issue.

forth circumstances in which the attorney must withdraw (mandatory withdrawal) and when an attorney may withdraw (voluntary withdrawal) from representation. A lawyer may voluntarily withdraw from representation under certain delineated circumstances, including when:

> (1) Withdrawal can be accomplished without material adverse effect on the interests of the client;
>
> (2) The client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent;
>
> (3) The client has used the lawyer's services to perpetrate a crime or fraud;
>
> (4) The client insists upon taking action that the lawyer considers repugnant or with which the lawyer has a fundamental disagreement;
>
> (5) The client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services and has been given reasonable warning that the lawyer will withdraw unless the obligation is fulfilled;
>
> (6) The representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or
>
> (7) Other good cause for withdrawal exists.

SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.16(b).

[¶51.] Here, the contractual withdrawal provision unduly infringed on Thovson's right, under Rule 1.2, to make settlement decisions when it gave Attorneys the authority to withdraw and file a lien for the full amount of the

contingency fee based on his refusal to accept Farmers Union's offer.[7]  Indeed, Culhane acknowledged the detriment to Thovson when he informed Thovson that "it will be difficult, if not impossible to find additional counsel to represent you without paying by the hour" and that filing the lien would put the opposing parties on notice that Thovson was no longer represented.

[¶52.]    Further, the contractual provision entitled Attorneys to withdraw from representation without regard to the requirements of Rule 1.16 and gave Attorneys the unilateral authority to determine what constitutes a "reasonable" offer of settlement.  This type of withdrawal provision exacerbates the imbalance of authority favoring the attorney to the detriment of the client.  Pursuant to the plain language of the provision, Attorneys had the exclusive power to determine when an offer of settlement was "reasonable" and to unilaterally determine when their work was complete thereby entitling them to their full contingency fee.  Such a provision impermissibly abrogates the client's right to accept or reject a settlement and impermissibly limits the lawyer's exposure to risk to the detriment of the client.

---

7.    The dissent, while reciting these rules, fails to consider the mandate of Rule 1.2. that "[a] lawyer *shall abide* by a client's decision to settle a matter." SDCL 16-18 App., Rules of Professional Conduct, Rule 1.2 (emphasis added). Further, although the dissent cites to our decision in *In re Discipline of Dorothy* for the proposition that a fee agreement is "not an ordinary business contract[,]" it ignores the next sentence, where we state, "Although the lawyer is certainly free to consider his own interests, *the primary concerns are those of the client.*" 2000 S.D. 23, ¶ 22, 605 N.W.2d at 499 (emphasis added).  Thus, it is "generally held that the lawyer may not burden the client's ability to make settlement decisions by structuring the representation agreement so as to allow the lawyer to withdraw, or to ratchet up the cost of representation, if the client refuses an offer of settlement."  *Nehad v. Mukasey*, 535 F.3d 962, 971 (9th Cir. 2008).

[¶53.] Even fundamental contract principles, upon which the dissent relies, do not support allowing Attorneys' recovery of a contingent fee after withdrawal. "When an attorney-client relationship that was originally established under a contingent fee contract terminates, the contract no longer exists and neither party can therefore seek to enforce the terms of the nonexistent contract." *Forest Pres. Dist. of Cook Cnty. v. Cont'l Cmty. Bank & Tr. Co.*, 98 N.E.3d 459, 472 (Ill. App. Ct. 2017) (citations omitted). This is consistent with Section 3 of LSA 1 and LSA 2, which provide that "[i]f no recovery is obtained *for the client,* no attorneys' fees whatsoever will be charged." (Emphasis added.) Upon recovery, however, Section 3 provided for a fee of 1/3 "of the total recovery the client obtains . . . [and Culhane] will be considered to have completed the professional services contemplated by this agreement, and therefore will be entitled to [the 1/3 fee], upon either settlement of the claim or entry of judgment[.]" Attorneys' right to a fee under this provision did not occur because they withdrew prior to the case being settled and there was not an existing attorney-client relationship when Thovson later settled the case.

[¶54.] Additionally, the LSA itself is inconsistent. Attorneys seek fees under Section 8 of the agreement permitting them to "retain a lien against the claim for costs" and a 1/3 contingent fee in the event Thovson "refuses to accept an offer that is, in the opinion of [Culhane], fair and reasonable." But Section 3 of the agreement provides that "no attorneys' fees whatsoever will be charged" if the attorney does not obtain a recovery "for the client[.]" Enforcing the provision is also inconsistent with the client's exclusive right to decide whether to settle a case under SDCL 16-18 App., Rules of Professional Conduct, Rule 1.2, which provides "[a] lawyer shall abide

by a client's decision whether to settle a matter." Indeed, by providing the attorney with the unfettered right to determine whether the offer is "fair and reasonable" the lawyer no longer need abide by the client's settlement decision to collect a contingent fee.

[¶55.] In determining whether Attorneys should recover their contingent fee, we also consider the nature of contingent fees, which have the potential to "create potential conflicts of interest between the lawyer and the client with respect to settlement." Douglas R. Richmond, *Turns of the Contingent Fee Key to the Courthouse Door*, 65 Buff. L. Rev. 915, 922 (2017). Contingent fee arrangements involve a unique allocation of the benefits and risks to the attorney and client. A contingent fee arrangement benefits the client because it "enable[s] persons who could not otherwise afford an attorney to assert their rights" by insulating them against the risk of paying for substantial attorney fees if their claims are ultimately unsuccessful. *See Bell & Marra, pllc v. Sullivan*, 6 P.3d 965, 970 (Mont. 2000). Additionally, because the attorney's compensation is dependent on the client's recovery, the attorney has a greater "incentive to seek the best result for their clients and to encourage only those clients having a substantial likelihood of succeeding." *Id.* An attorney benefits by charging a higher fee to account for the risk they assume and can use the recovery of a fee in a successful case to insure themselves and their other clients against the cost of losing. *Id.* "Put another way, the lawyer is entitled to premium compensation for assuming what is in most cases the real risk of receiving no fee for her efforts." Richmond, *supra* at 931. And the

higher fee "compensates the lawyer for the delay between the performance of legal services and the payment for them." *Id.*

[¶56.]     But both attorney and client must accept the drawbacks of a contingent fee arrangement and the associated risks. A client in a successful case may be contractually obligated to pay a higher fee than what would be owed under an hourly fee arrangement. Of course, the attorney must accept the risk of recovering nothing for their client and, therefore, receiving no payment for their services. This includes the inherent risk "that a client will make a disappointing settlement decision[.]" *Id.* at 928.

[¶57.]     Here, Thovson did just that—he made a settlement decision with which Attorneys did not agree. Such a decision is one of the many risks involved in a contingent fee arrangement. While disappointing to Attorneys, it does not allow them to recover their *contractual* contingent fee after withdrawing. Accordingly, we conclude that the rules of professional conduct "establish that an attorney may not collect a fee for services arising from a contingency arrangement if the attorney withdraws from the representation without good cause." *Bell & Marra*, 6 P.3d at 969.

[¶58.]     The necessary corollary to this holding is that when good cause exists, an attorney may withdraw and recover their fees in quantum meruit. "If the withdrawal was for good cause or was justified, then the attorney may recover based on quantum meruit." *Id.* at 970 (citing *Ausler v. Ramsey*, 868 P.2d 877, 880 (Wash. Ct. App. 1994)). "There is little doubt that an attorney who withdraws from a case for justifiable reason, or is terminated by his client without cause, may

recover compensation for his services." *Jenkins v. Dist. Ct. In & For Eighth Jud. Dist.*, 676 P.2d 1201, 1204 (Colo. 1984); *see also Kannewurf v. Johns*, 632 N.E.2d 711, 715 (Ill. App. Ct. 1994) (concluding an attorney's withdrawal under a contingency fee arrangement where a client refuses to accept a reasonable settlement offer does not "automatically bar an attorney who withdraws from a case from receiving compensation for legal services under a *quantum meruit* theory").

[¶59.]     We have not previously addressed quantum meruit recovery in this context, but other courts generally apply the same factors for determining a reasonable fee that this Court has applied for determining reasonable attorney fees in other contexts.  *See Crisman v. Determan Chiropractic, Inc.*, 2004 S.D. 103, ¶ 27, 687 N.W.2d 507, 513; *Faircy L. Firm, P.A. v. API, Inc. Asbestos Settlement Tr.*, 912 N.W.2d 652, 658 (Minn. 2018); *Dikmen v. Peoples Gas Light & Coke Co.*, No. 1-22-1806, 2023 WL 5935750, at *6 (Ill. App. Ct. Sep. 12, 2023).  "The existence of a contingency fee contract may be one of the factors considered in the calculation of a quantum meruit recovery[.]"  *L. Offices of J.E. Losavio, Jr. v. L. Firm of Michael W. McDivitt, P.C.*, 865 P.2d 934, 936 (Colo. App. 1993).

[¶60.]     "Under a quantum meruit claim, an attorney is entitled to have his fees valued both in light of the amount of work he has done, and also by the results accomplished.  Accordingly, the trial court must determine whether [the client] received any benefit from [the attorney's] services, and if so, the value of those services rendered and received."  *Sutherland v. Hammers*, 916 S.E.2d 493, 499 (Ga. Ct. App. 2025) (alterations in original); *see also Lewis v. Haskell Slaughter Young & Rediker, LLC*, 582 Fed. Appx. 810, 814 (11th Cir. 2014) (holding under Alabama law

that the district court's award of a 45% contingent fee to an attorney in quantum meruit was not an abuse of discretion where the attorney withdrew for good cause prior to the completion of the case).

[¶61.] Under the undisputed facts presented here, we conclude that Attorneys have established good cause for their withdrawal. Attorneys worked on the case prior to filing suit, obtained co-counsel in North Dakota, discovered and preserved crucial evidence, investigated the available insurance coverages, analyzed the financial ability of the defendants to pay the judgment above policy limits, negotiated a $500,000 settlement, and a waiver of Thovson's insurer's right to reimbursement for the $30,000 in med pay benefits. Attorneys also reduced their contingent fee. At the conclusion of this process, Attorneys determined that Thovson would be unable to recover more than the $500,000.

[¶62.] Thovson has not presented any evidence that Attorneys failed to diligently pursue his position that he could have recovered more than $500,000 had the suit been filed, or that he was prejudiced in his ability to pursue or settle the claim because of Attorneys' withdrawal. In fact, Thovson later settled the case for exactly the same amount Attorneys had negotiated. These undisputed facts establish that "other good cause for withdrawal" existed. SDCL 16-18 App., Rules of Professional Conduct, Rule 1.16(b)(7).[8]

---

8. The facts and circumstances of the parties' contract and their later disagreement regarding the settlement offer set forth in the dissent relate to Attorneys' good cause for withdrawal, not to the enforceability of the contractual provision providing Culhane with a lien and right to collect a 1/3 fee upon withdrawal, which is a different matter altogether.

[¶63.] Good cause is also established by the undisputed facts showing that the attorney-client relationship had broken down between Attorneys and Thovson, as they were unable to resolve their differences as to settlement and any fee reduction that Thovson sought as a condition of his agreement to settle. Significantly, there is no evidence that Attorneys' settlement advice was anything but appropriate under the circumstances. Thovson was also informed and agreed that Attorneys could withdraw under such circumstances. There was nothing improper about this particular provision in Section 8, and the provision provided Thovson with notice from the time Attorneys were retained that Attorneys could withdraw in the event of a dispute about settlement. Further, Thovson has not presented any evidence that Attorneys' withdrawal had a "material[ly] adverse effect" on him as it occurred prior to suit and Thovson ultimately settled for the same amount Culhane had negotiated prior to withdrawal. *See* SDCL 16-18 App., Rules of Professional Conduct, Rule 1.16(b)(1).

[¶64.] For these reasons, we conclude that the circuit court erred in determining that Attorneys may recover their contingent fee as set forth in the LSA. However, after reviewing the record we conclude that Attorneys withdrew for good cause and may, based on principles of quantum meruit, recover their reasonable fees incurred prior to withdrawal.

### 3. *Whether the circuit court erred by granting Attorneys' motion for partial summary judgment resulting in the dismissal of Thovson's counterclaims.*

[¶65.] Thovson asserted six counterclaims in response to Attorneys' complaint—actual fraud pursuant to N.D.C.C. § 9-03-08, recission pursuant to

N.D.C.C. §§ 9-08-08 and 9-08-09, rescission pursuant to N.D.C.C. § 9-09-02, breach of fiduciary duty against Turbak Law, breach of contract, and deceit pursuant to SDCL 16-18-28 and 16-18-26(1). Attorneys filed a motion for partial summary judgment on all of Thovson's counterclaims, which the circuit court granted. Thovson challenges the grant of summary judgment regarding only his claims for recission under N.D.C.C. §§ 9-08-08 and 9-08-09, breach of fiduciary duty, and deceit. Because we conclude that North Dakota law does not apply to this dispute, we affirm the circuit court's grant of summary judgment as to Thovson's recission counterclaim brought pursuant to N.D.C.C. §§ 9-08-08 and 9-08-09.

### *Breach of Fiduciary Duty*

[¶66.] Thovson initially claimed that Attorneys breached their fiduciary duty by inducing him into signing LSA 2 "which [they] knew not to be in his best interests" and withheld their "actual knowledge of information that would have deterred [Thovson from] entering into the agreement." Specifically, Thovson alleged that Attorneys withheld the information that Farmers Union tendered the second $250,000 until after Thovson signed LSA 2. Further, he contends Attorneys told him that there was "likely" video footage of the accident when they already knew that the footage existed and allegedly knew that it clearly established fault for the accident.

[¶67.] Attorneys, however, informed the circuit court that the undisputed evidence established that they had not seen the video prior to the execution of LSA 2 and, therefore, did not know what it depicted. Further, they argued that LSA 2 was substantively identical to LSA 1 aside from the deletion of a provision

regarding sales tax. Because LSA 2 did not create any obligations not already agreed to in LSA 1, they asserted that Thovson could not prove damages resulting from the allegedly fraudulent statements or omissions. The circuit court concluded that Thovson's claim failed as a matter of law because he "did not present any legal authority or expert opinion supporting a conclusion that [Attorneys] breached any fiduciary duty and, even if he had, [Thovson] did not present evidence of any resulting damages."

[¶68.] On appeal, Thovson now abandons his prior arguments and instead asserts that Attorneys breached their fiduciary duty by failing to inform him of his right to rescind their contracts pursuant to N.D.C.C. §§ 9-08-08 and 9-08-09 and by terminating the contract prior to the end of the six-month rescission window. Such termination, he contends, "made it impossible for Thovson to exercise his statutory rights in compliance with North Dakota public policy." "We have repeatedly stated that we will not address for the first time on appeal issues not raised below." *Hall v. State ex rel. S.D. Dep't of Transp.*, 2006 S.D. 24, ¶ 12, 712 N.W.2d 22, 27. Because Thovson did not raise this theory below as a basis for his breach of fiduciary duty claim, we decline to address it in the first instance here.

### *Deceit*

[¶69.] Thovson alleged in his counterclaim that Attorneys engaged in deceit when they induced Thovson into signing LSA 2, despite knowing that Farmers Union offered the policy limits. SDCL 16-18-26(1) makes it a misdemeanor for any attorney to "practice[] any deceit or collusion, or consent[] to the same with intent to deceive the court or any party[.]" SDCL 16-18-28 creates a civil cause of action by

the injured party against the attorney who violates SDCL 16-18-26(1) entitling the injured party to treble damages. Just as with the breach of fiduciary duty claim, Attorneys argued before the circuit court that the evidence failed to establish intent to deceive or resulting damages.

[¶70.]     In response to Attorneys' motion for summary judgment, Thovson recalibrated his argument and asserted that Culhane engaged in deceit when he induced Thovson into signing LSA 1. He claimed that he initially went to Culhane only "to make sure the crime scene was secured," but that Culhane's statements during the initial meeting on August 7, 2020, convinced him to agree to retain Culhane to represent him in a wrongful death action. Thovson asserted that Culhane spoke about how difficult insurance companies were to work with and claimed Thovson would have to fight to convince the insurance company to pay. Additionally, Thovson claimed that he told Culhane that he was interested in accountability rather than money, and that Culhane failed to tell Thovson that accountability would come in the form of "the insurance company writing a check."

[¶71.]     In an affidavit from Thovson's daughter, she attested that during the August 7 meeting, Culhane told Thovson that it would be a tough fight to get the insurance companies to pay and "that he would hold the perpetrator responsible but that a wrongful death case in North Dakota was going to take a large amount of money" and "trial costs would be high." Thovson argued that whether Culhane believed it would be hard to convince the insurance company to pay is a question of fact that is not suitable for summary judgment. The circuit court concluded that this claim "fail[ed] as a matter of law because [Thovson] presented no evidence of

any acts of deceit or collusion committed by [Attorneys] and, even if he had, [Thovson] did not present evidence of resulting damages[.]"

[¶72.]     On appeal, Thovson renews his argument that disposition of this issue on summary judgment was improper because Culhane's belief as to the truthfulness of his statements is a question of fact.  However, even if we assume that Culhane made the statements and did not believe them to be true, Thovson's claim fails on two other grounds.  First, the content of Thovson's initial text message to Culhane contradicts his position that Culhane's statements induced Thovson into retaining Turbak Law.  In the message sent on August 4, 2020, Thovson stated, "Eric Meyer strongly encouraged me to contact you and see if you'd be interested in *representing me* on my wife's . . . fatal automobile crash."  (Emphasis added.)  On August 6, Thovson and Culhane exchanged e-mails regarding LSA 1 and Thovson confirmed his understanding of the fee agreement by outlining the division of attorney fees and costs assuming a recovery of $100,000.  Thovson concluded by stating, "If the above example represents the math you are proposing to use, then I'd plan to be in your office to sign the Legal Services Agreement tomorrow morning, if that is acceptable to you."  Therefore, Thovson's documented statements contradict his position that Culhane induced him into signing LSA 1 by emphasizing how difficult it would be to convince the insurance companies to pay.  From their first interaction, Thovson sought Culhane's representation and expressed his intent to sign LSA 1 before stepping foot in Turbak's office on August 7, 2020.

[¶73.]     Second, Culhane's statements referred to events in the future and we have held:

> [a]s a general rule false representations upon which fraud may be predicated must be of existing facts which previously existed, and cannot consist of mere promises or conjectures as to future acts or events, although such promises are subsequently broken, unless the promise includes a misrepresentation of existing fact or a statement as to some matter peculiarly within the speaker's knowledge, and he makes the statement as a fact.

*W. Townsite Co. v. Novotny*, 143 N.W. 895, 895 (S.D. 1913) (citation omitted). The statements Thovson highlights in support of his claim are promises or opinions about future events—namely, the amount of effort it would take to get the insurance companies to pay and that Culhane would hold Dean responsible for Paula's death. These statements are insufficient to establish a claim for deceit based on false representations. Accordingly, we conclude that the circuit court did not err by granting Attorneys' motion for summary judgment on Thovson's counterclaims.

## Conclusion

[¶74.] We conclude that the circuit court properly applied South Dakota law to this dispute. We further conclude that Attorneys may recover their attorney fees, but under principles of quantum meruit and, therefore, remand for a determination of the reasonable value of Attorneys' services prior to their withdrawal. We affirm the circuit court's grant of summary judgment as to Thovson's counterclaims.

[¶75.] Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

[¶76.] DEVANEY, Justice, concurs.

[¶77.] JENSEN, Chief Justice, concurs specially.

[¶78.] SALTER and MYREN, Justices, concur in part and dissent in part.

[¶79.] GUSINSKY, Justice, not having been a member of the Court at the time this action was considered by the Court, did not participate.

JENSEN, Chief Justice (concurring specially).

[¶80.] I join the majority opinion. I write specially to highlight that Attorneys were not entitled to any contractual attorney's fees under the plain terms of the LSA when the "contingency" for payment of fees had not occurred before they withdrew. Neither Paragraph 3 nor Paragraph 8 of the LSA can be read to support Attorneys' claim that they are entitled to contractual attorney's fees.

[¶81.] Paragraph 3 of the LSA provided that the contingency for attorney's fees under the LSA would only occur when Attorneys "have completed the professional services contemplated by the [LSA] . . . upon either settlement of the claim or entry of judgment[.]" Under this provision, "[i]f no recovery is obtained *for the client*, no attorneys' fees whatsoever will be charged." (Emphasis added.) It is undisputed that Thovson settled the claim for his wife's death on July 18, 2022, more than six months after Attorneys withdrew from representing him. As such, attorney's fees were never earned under Paragraph 3 of the LSA because the contingency of either settlement or judgment did not occur while Attorneys were representing Thovson.

[¶82.] Contrary to the assertion of Attorneys and the dissent, Paragraph 8 of the LSA did not and could not create an alternative contractual basis for fees to be paid to Attorneys. Rather, Paragraph 8 reaffirmed that the contingency of settlement, entitling Attorneys to be paid fees under the LSA, would not occur until Thovson consented to the settlement by providing that "[i]t is the right and

responsibility of the client to decide whether or not to accept any settlement offer."
*See* SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter.").

[¶83.] Paragraph 8, providing for an attorney's fee lien, stated if "the client refuses to accept an offer" that Attorneys believe is "fair and reasonable," Attorneys have "the right to withdraw . . . *and retain a lien against the claim* . . . for fees equal to [one-third] of that offer[.]" (Emphasis added.) An attorney's lien provides a mechanism for securing and enforcing *attorney's fees owed*; it does not create a right to attorney's fees which were never earned under the plain language of the LSA. *See* SDCL 16-18-21 (emphasis added) ("An attorney and counselor at law has *a lien for a general balance of compensation* in and for each case[.]"). At the time Attorneys withdrew, there was no compensation owed under the LSA.

[¶84.] The reading of Paragraph 8 of the LSA by Attorneys and the dissent not only circumvents the plain language of Paragraph 3 of the LSA; it is also repugnant to South Dakota law by permitting the attorney's "opinion" of a "fair and reasonable" settlement to override the client's exclusive right to decide whether to settle a matter under Rule 1.2(a). *See* SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.2(a); *see also Melstad v. Kovac*, 2006 S.D. 92, ¶ 12, 723 N.W.2d 699, 704 (citation omitted) ("While an attorney 'may negotiate for and advise settlement of controversy,' the decision to settle belongs to the client."). "A contract is unlawful if it violates 'an express provision of law or . . . the policy of express law[.]'" *L. Cap., Inc. v. Kettering*, 2013 S.D. 66, ¶ 10, 836 N.W.2d 642, 645. "Public policy is found in

the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision." *Id.* (citation omitted).

[¶85.] I agree with the majority opinion that the overwhelming weight of authority provides that an attorney who withdraws before the contingency for fees occurs is not entitled to attorney's fees under the contract. Further, an attorney who withdraws *without good cause*, prior to completing the services under a contingency fee contract is not entitled to recover any fees. This latter principle has long been the rule in South Dakota. In *Egan v. Waggoner*, 170 N.W. 142, 143 (S.D. 1918) and *Davenport v. Waggoner*, 207 N.W. 972, 974–75 (S.D. 1926), this Court denied attorney's fees to one of the attorneys representing a client for a contingency fee after the attorney was disbarred before the case was resolved.

> [Disbarred attorney's] employment was to assist them by the rendition of personal services until the final termination of the [client's] case, upon a contingent fee, and such contract was entire and not severable or divisible, and, having abandoned said contract before the [client's] case was terminated, without just cause, as settled by the former appeal, we believe the sounder rule to be that by such abandonment he forfeited all right to payment for any services previously rendered.

*Davenport*, 207 N.W. at 974.

[¶86.] Nonetheless, I agree with the majority opinion's conclusion on this record that Attorneys withdrew for good cause and may recover in quantum meruit for the reasonable value of the services provided before Attorneys withdrew. In particular, good cause is established by the fact that Thovson was unwilling to pay the attorney's fees which would have been owed based upon the proposed

settlement, a settlement Thovson ultimately accepted after Attorneys had withdrawn.[9]  *See* SDCL 16-18 App., Rules of Prof. Conduct, Rule 1.16(b).

[¶87.]        For these reasons, I join the majority opinion in remanding the case to the circuit court for further proceedings to determine the reasonable value of the services Attorneys are entitled to recover in quantum meruit.

MYREN, Justice (concurring in part and dissenting in part).

[¶88.]        I join the majority opinion's resolution of issues one and three.  I would resolve issue two differently and write specially to explain my view on that issue.

[¶89.]        "In interpreting a contract, we seek to ascertain and give effect to the intention of the parties; at the same time, to find the intention of the parties, we rely on the contract language they actually used."  *Carstensen Contracting, Inc. v. Mid-Dakota Rural Water Sys., Inc.*, 2002 S.D. 136, ¶ 8, 653 N.W.2d 875, 877 (footnote omitted) (citation omitted).  "Ordinarily, the plain meaning of the contract language will be followed unless there is some ambiguity or different intent manifested."  *Id.* (citation omitted).

---

9.    The case has some appearance of Thovson wanting to discharge Attorneys, but courts have applied the same rule when an attorney is discharged by the client without cause before the contingency has occurred.  "Generally, an attorney who is discharged [by the client without cause] before the occurrence of the contingency provided for in a contingency fee contract may not recover compensation on the basis of the contract, but rather the attorney is entitled only to the reasonable value of the services rendered based upon quantum meruit."  *Consolver v. Hotze*, 395 P.3d 405, 411 (Kan. 2017) (citation omitted); *see also Goncharuk v. Barrong*, 133 P.3d 510, 512–13 (Wash. Ct. App. 2006); *Zaklama v. Mount Sinai Med. Ctr.*, 906 F.2d 650, 652 (11th Cir. 1990) (per curiam) (applying Florida law).

[¶90.]    However, even when the contractual intentions of the parties are clear and unambiguous, there are circumstances where other considerations preclude the enforcement of that contract. One such instance is when a contract provision violates public policy. *See Domson, Inc. v. Kadrmas Lee & Jackson, Inc.*, 2018 S.D. 67, ¶ 15, 918 N.W.2d 396, 401 ("It is well settled that '[a] contract provision contrary to an express provision of law or to the policy of express law . . . is unlawful.'" (alteration in original) (quoting SDCL 53-9-1)); s*ee also Bartron v. Codington Cnty.*, 68 S.D. 309, 2 N.W.2d 337, 344 (1942) ("[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear[s] that [the contract] contravene[s] public right or the public welfare." (quoting *Balt. & Ohio Sw. Ry. Co. v. Voight*, 176 U.S. 498, 505 (1900)).

[¶91.]    To resolve this issue, we must consider: (1) the text of the contingent-fee agreement to ascertain the intention of the parties; and (2) whether the text of the contingent-fee agreement violates public policy or is otherwise unenforceable.

[¶92.]    Section 8 of the parties' contingent fee agreement provides:

> It is the right and responsibility of the client to decide whether or not to accept any settlement offer. If the client refuses to accept an offer that is, in the opinion of Turbak Law Office, P.C., fair and reasonable, Turbak Law Office, P.C. has the right to withdraw from representation of the client on the matter and retain a lien against the claim for costs incurred in pursuit of the claim and for fees equal to 33.33% (1/3) of that offer, less costs, together with sales tax on fees as required by state law.

The language in Section 8 of the contingent fee agreement is "clear and explicit and lead[s] to no absurd consequences," thus "the search for the parties' common intent

is at an end." *Black Hills Excavating Servs., Inc. v. Retail Constr. Servs., Inc.*, 2016 S.D. 23, ¶ 16, 877 N.W.2d 318, 325 (citation omitted).

[¶93.]     The first sentence of Section 8 clarifies that the decision to settle the case rests solely with the client, Thovson.  The remainder of Section 8 explains that if Thovson receives and refuses an offer that Turbak Law Office believes is fair and reasonable, then Turbak Law Office may withdraw and retain a lien against the claim for one-third of the settlement offer.[10]  There is nothing ambiguous about this language, and it clearly reveals the parties' intentions when they entered into the agreement.  Because the parties' intentions are clearly expressed in Section 8 of the contingent-fee agreement, it is legally enforceable unless it violates public policy or Culhane's professional obligations to his client.

[¶94.]     "[A] fee agreement between lawyer and client is not an ordinary business contract." *In re Discipline of Dorothy*, 2000 S.D. 23, ¶ 22, 605 N.W.2d 493, 500 (quoting *In re Struthers*, 877 P.2d 789, 796 (Ariz. 1994) (en banc)).  Still, "the lawyer is certainly free to consider his own interests[.]" *Id.* (citation omitted). SDCL 16-18 App. Rules of Professional Conduct Rule 1.2(a) provides: "[a] lawyer shall abide by a client's decision to settle a matter."  Additionally, SDCL 16-18 App. Rules of Professional Conduct, Rule 1.16(b) authorizes an attorney to withdraw in seven specifically identified alternative circumstances.  Under Rule 1.16(b)(1),

---

10.     The fact that the negotiated provision left the assessment of whether an offer was "fair and reasonable" to the attorney may be problematic in some circumstances, but it is not in this case.  There is no indication in the record that Thovson could have obtained any recovery beyond the settlement offer.

Culhane could withdraw if it could "be accomplished without material adverse effect on the interests of the client[.]"

[¶95.] Thovson, a sophisticated businessman with significant prior experience with legal representation and the legal process, retained Culhane to represent him. Thovson and Culhane meticulously negotiated the contingent-fee agreement. After undertaking the representation, Culhane obtained a settlement offer of $500,000. Thovson was reluctant to settle for that amount, and so, at his direction, Culhane made additional efforts to get a larger settlement offer. Culhane was unable to increase the settlement offer. When advised of the final offer, Thovson declined to accept it. Culhane informed Thovson that, in his opinion, no additional recovery could be obtained. Nevertheless, Thovson decided to reject the offer. Culhane reminded Thovson of the fee agreement provision that allowed Culhane to withdraw if Thovson rejected a fair and reasonable offer. Culhane withdrew and informed Thovson. After his withdrawal, Culhane continued to safeguard Thovson's interests by maintaining contact with Thovson and providing reminders about the approaching statute of limitations deadline. Ultimately, Thovson accepted the offer Culhane negotiated on his behalf. No evidence in this record suggests that any additional settlement amount was possible.

[¶96.] In the unique circumstances of this case, I would conclude Section 8 of the contingent-fee agreement is enforceable. Section 8 of the contingent-fee agreement did not purport to grant Culhane the ability to decide whether Thovson would accept or reject a settlement offer. Instead, the contingent-fee agreement expressly clarified that it was "the right and responsibility of the client to decide

whether or not to accept any settlement offer." Culhane obtained the settlement offer, withdrew when Thovson refused to accept it (pursuant to the negotiated contract term), and then maintained contact with Thovson to remind him of important considerations, such as the approaching statute of limitations deadline. Culhane's withdrawal did not interfere with Thovson's right to decide whether to settle the matter, and Culhane's withdrawal was accomplished without material adverse effects on the interests of the client. Thereafter, Thovson accepted the settlement offer for the precise amount Culhane negotiated before he withdrew. Culhane fulfilled his ethical obligations to his client, and the contingent-fee agreement does not violate public policy. Section 8 of the contingent-fee agreement is enforceable.

[¶97.] This is not a situation of a lawyer taking advantage of a client unfamiliar with legal processes. The record establishes that Thovson is a sophisticated businessman with significant prior experience with legal representation and the legal process. He and Culhane meticulously negotiated the contingent fee agreement. While such a withdrawal provision negotiated with a less sophisticated client may raise public policy concerns in other cases, the unique facts of this relationship do not. We do not need to explore those considerations to resolve this case. I would hold that Section 8 of the contingent fee agreement is enforceable and that Culhane is entitled to the compensation he and Thovson negotiated.

[¶98.] SALTER, Justice, joins this writing.